FILED
2010 Jan-25 PM 05:27
U.S. DISTRICT COURT
N.D. OF ALABAMA

# EXHIBIT 4

```
 1                    IN THE DISTRICT COURT
                FOR THE NORTHERN DISTRICT OF ALABAMA
 2                      SOUTHERN DIVISION

 3

 4   ANGELA M. HALL,                    )
                                        )
 5                                      )
                       Plaintiff,       )
 6                                      )
     vs.                                ) CIVIL ACTION NO.:
 7                                      ) CV-09-BE-0647-S
     I.C. System, Inc., a Corporation   )
 8                                      )
                                        )
 9                     Defendant.       )
                                        )
10

11

12            DEPOSITION OF NANCY BRITTON, taken pursuant to

13   Notice and Agreement under the Rules of Civil Procedure

14   for the District Courts of Minnesota, and taken at the

15   law office of Barry & Slade, 2021 East Hennepin Avenue,

16   Suite 195, in the City of Minneapolis, State of

17   Minnesota, on the 18th day of November, 2009, at

18   11:40 a.m., before Lori L. Okeson, RPR, a Notary Public

19   in and for the County of Stearns, State of Minnesota.

20

21

22

23

24

25
```

Chaser Court Reporting <><><>  (612) 986-5960

1                              I N D E X

2    **EXAMINATION**                                          **PAGE**

3        By Mr. Herring                                        4

4

5

6    **OBJECTIONS:**

7        By Mr. Scott:      11, 29, 30, 35, 47, 53, 54, 55,
                            59, 60
8

9

10   **INFORMATION/DOCUMENT REQUEST:**

11       **By Mr. Herring:**

12           Copy of the materials with the statement
             that in Alabama you're allowed to ask a
13           neighbor to deliver a message to a
             debtor                                           35
14

15           Sheet that tells what the various state
             laws are that Ms. Britton keeps at her
16           desk                                             36

17

18
     **INSTRUCTIONS NOT TO ANSWER:**
19
             None.
20

21

22

23

24

25

Chaser Court Reporting <><><> (612) 986-5960

```
 1    APPEARANCES:

 2

 3          M. Stan Herring, Attorney at Law, The Kress

 4    Building, 301 Nineteenth Street North, Birmingham,

 5    Alabama 35203, appearing on behalf of the Plaintiff.

 6

 7          John W. Scott, Scott, Dukes & Geisler, P.C., 2100

 8    Third Avenue North, Suite 700, Birmingham, Alabama 35203,

 9    appearing on behalf of the Defendant.

10

11    ALSO PRESENT:  Sue Johnson

12

13

14

15                (WHEREUPON, the following proceedings were

16          duly had:--)

17

18

19

20

21

22

23

24

25
```

```
 1                              NANCY BRITTON,

 2                    after having been first duly sworn,

 3                      states on her oath as follows:

 4                                   ***

 5                               EXAMINATION

 6      BY MR. HERRING:

 7      Q.   Will you please identify yourself for the record?

 8      A.   Nancy Britton.

 9      Q.   And where are you currently employed, Ms. Britton?

10      A.   I.C. Systems.

11      Q.   And how long have you been employed with

12           I.C. Systems?

13      A.   At this time, two years.

14      Q.   And when were you first hired by I.C. Systems?

15      A.   The first time would have been in '05, I believe.

16      Q.   Okay.  And what were you hired to do in 2005 for

17           I.C. Systems?

18      A.   Bill collector.

19      Q.   And how long were you with I.C. Systems before you

20           left?

21      A.   At that point, I believe, six months.

22      Q.   Okay.  And why did you leave?

23      A.   I don't recall.

24      Q.   Did you leave in 2005 or 2006?

25      A.   I left in 2005.
```

```
 1    Q.    Okay.  And you don't recall why it was that you
 2          left?
 3    A.    I don't know if -- no, I don't.  I don't know if it
 4          at that point was personal reasons.
 5    Q.    Where -- did you leave as a result of any kind of
 6          on-the-job disciplinary action?
 7    A.    Absolutely not.
 8    Q.    Okay.  Have you ever been disciplined by
 9          I.C. Systems for anything related to collection
10          activities?
11    A.    No.
12    Q.    And where did you work after you left I.C. Systems?
13    A.    I worked at People First Recoveries.
14    Q.    Is that another debt collector?
15    A.    Yes.
16    Q.    And what did you do for them?
17    A.    I was a collections manager.
18    Q.    And how long did you work there?
19    A.    A year.
20    Q.    And when did you leave there in 2006?
21    A.    Actually, I took time off.  I didn't -- I was with
22          them immediately before this two-year period with
23          I.C. System.
24    Q.    Okay.  So you took time off between I.C. Systems
25          and People First?
```

NANCY BRITTON                              6

```
 1    A.    Um-hum.

 2    Q.    And when was it that you were rehired by

 3          I.C. Systems?

 4    A.    '07.

 5    Q.    When in '07?

 6    A.    September.

 7    Q.    And you've worked continuously for I.C. Systems up

 8          until the present?

 9    A.    Correct.

10    Q.    What's your current address?

11    A.    _ _                            Baldwin, Wisconsin

12

13    Q.    And how far is that from I.C. Systems?

14    A.    Approximately, 90 miles roundtrip.

15    Q.    Roundtrip?

16    A.    Yep.

17    Q.    Okay.  So about 45 miles away?

18    A.    Sure.

19    Q.    And tell me about your education.

20    A.    I went to high school, graduated.

21    Q.    Did you get a diploma?

22    A.    Yep.

23    Q.    And what was the name of that high school?

24    A.    Spring Valley High School.

25    Q.    Did you go to college after that?
```

1    A.    I did do some college.

2    Q.    Where did you go to college?

3    A.    High Tech University.

4    Q.    Where is that?

5    A.    Bloomington, I believe is the address.

6    Q.    Yes, please.

7    A.    I said, "Bloomington, I believe is the address."  I

8          don't recall --

9    Q.    I thought you said, Do you want the address?  Did

10         you grow up in Illinois?

11   A.    Illinois?

12   Q.    Or Indiana.  I'm sorry.  Indiana.  Where is

13         Bloomington?

14   A.    Minnesota.

15   Q.    Oh, okay.  There's lots of Bloomington's.

16               MR. SCOTT:  South of the city.

17   Q.    (By Mr. Herring) Okay.  So you grew up in

18         Minnesota?

19   A.    Wisconsin.

20   Q.    Okay.  Wisconsin.  And did you get a degree from

21         High Tech University?

22   A.    No.

23   Q.    What were you there to study?

24   A.    Certified nursing assistant.

25   Q.    And how long did you attend High Tech University?

1   A.   I don't recall.

2   Q.   Was it more or less than a year?

3   A.   I don't remember.  I did not finish the program.

4   Q.   Okay.  And why is that?

5   A.   I went back to work full time.

6   Q.   And by the way, when did you graduate high school?

7   A.   '95.

8   Q.   How long have you worked in the debt collection

9        industry?

10  A.   Eight years.

11  Q.   Okay.  Since --

12  A.   On and off, eight years.

13  Q.   Since 2001?

14  A.   Um-hum.

15  Q.   And what was the first debt collection company you

16       worked for?

17  A.   Alliance One.

18  Q.   Where are they located?

19  A.   Mendota Heights, Minnesota.

20  Q.   How long did you work for them?

21  A.   Over three years.

22  Q.   Okay.  And why did you leave there?

23  A.   Changes in pay structure.

24  Q.   And where did you go after that?

25  A.   That's when I went to I.C. System.

```
 1   Q.   Okay.  Did you take time off between

 2        I.C. System -- I mean Alliance One and

 3        I.C. Systems?

 4   A.   Nope.

 5   Q.   Are you represented by a lawyer today?

 6   A.   Yes.

 7                 MR. SCOTT:  Yes.

 8   Q.   (By Mr. Herring) Did you review any documents in

 9        preparation for your deposition?

10   A.   Yes.

11   Q.   And what did you review?

12   A.   Documentation on the accounts.

13   Q.   Okay.  Is that the collection notes?

14   A.   Correct.

15   Q.   Did you review any handwritten notes?

16   A.   No.

17   Q.   At the time that you were working Ms. Hall's

18        account, did you keep any handwritten notes?

19   A.   No.

20   Q.   Did you -- at the time you were working the

21        account, did you always type your notes directly

22        into the system?

23   A.   Yes.

24   Q.   Did you do that while you were talking or after you

25        got off the phone with the debtor?
```

1   A.   A little bit of both.

2   Q.   Okay.  Did you review any other documents?

3   A.   No.

4   Q.   Did you discuss your testimony with anyone prior to

5        today?

6             MR. SCOTT:  Besides me.

7             THE WITNESS:  No.

8   Q.   (By Mr. Herring) Besides the lawyer?

9   A.   (Witness shakes head.)

10  Q.   Did you speak -- have you spoken with

11       Jeremy Cleveland about his testimony?

12  A.   No.

13  Q.   Did you speak with Rod Volkers about his testimony?

14  A.   No.

15  Q.   Did you speak with Jeremy -- I can't remember

16       Jeremy's last name --

17  A.   Levitt.

18  Q.   Levitt.  -- about his testimony?

19  A.   No.

20  Q.   Did you speak with him about your testimony?

21  A.   No.

22  Q.   Did you speak with Sue Johnson about your

23       testimony?

24  A.   No.

25  Q.   Prior to today, you haven't discussed your

```
 1          testimony with anyone?

 2    A.    Other than him, no.

 3    Q.    Okay.  Did you discuss that with him prior to

 4          today?

 5    A.    Prior to today?

 6    Q.    Yes, ma'am.

 7    A.    I guess, can I clarify --

 8                MR. SCOTT:  Well, I'm going to object to

 9          what was discussed with me.

10                THE WITNESS:  Okay.

11                MR. SCOTT:  You can tell him if you met

12          with me.

13                THE WITNESS:  I met with him.

14    Q.    (By Mr. Herring) Prior to today?

15    A.    Yes.

16    Q.    Okay.  That's fine.  And have you -- this is a

17          little bit different question:  Have you discussed

18          Ms. Hall's file with anyone other than your

19          attorney prior to your testimony today?

20    A.    I guess I don't know what -- I guess I don't know

21          exactly what you're asking.  What do you mean?

22    Q.    Did you give a statement related to Ms. Hall's

23          file?

24    A.    No.  Oh, I apologize.  Yes.

25    Q.    Okay.
```

```
 1   A.   I apologize.  Yes.  When the -- when the -- when
 2        the case initially came up, yes.
 3   Q.   Okay.  And was that a recorded statement or a
 4        written statement?
 5   A.   Written.
 6   Q.   Okay.  Did you meet with any investigators --
 7        I.C. System's investigators regarding Ms. Hall's
 8        file?
 9   A.   No.
10   Q.   Okay.  Did you review Ms. Hall's file prior to
11        giving that statement?
12   A.   Yes.
13   Q.   Have you ever been arrested?
14   A.   Yes.
15   Q.   How many times?
16   A.   Twice.
17   Q.   And what was that for?
18   A.   DWI.
19   Q.   Both times?
20   A.   One time.  The other time was a warrant for bad
21        checks.
22   Q.   When were you arrested for DWI?
23   A.   Six years ago.  Five or six years ago.
24   Q.   And where was that?
25   A.   In Hammond, Wisconsin.
```

NANCY BRITTON                          13

1    Q.    Is Hammond the name of the city?

2    A.    Yes.

3    Q.    What county is it in?

4    A.    Pierce -- no.  I apologize.  St. Croix.

5    Q.    St. Croix?

6    A.    Correct.

7    Q.    How do you spell that?

8    A.    S-t. C-r-o-i-x.

9    Q.    And did you -- what was the result of that arrest?

10   A.    I got fined.

11   Q.    Did you plead guilty?  Was there a trial?

12   A.    I pled no -- no contest.  I'm sorry.

13   Q.    Okay.  Did you have to serve any time?

14   A.    No.

15   Q.    Did you have to pay a fine?

16   A.    Yes.

17   Q.    How much was that?

18   A.    I have no idea.

19   Q.    Okay.  The bad check, tell me about that.

20   A.    That was even longer ago.  I wrote a bad check.

21   Q.    Just one bad check?

22   A.    I don't directly recall.

23   Q.    Okay.  Could it have been more than one?

24   A.    It could have been.

25   Q.    Could it have been as many as ten?

1   A.   I highly -- no.

2   Q.   Could it have been as many as five?

3   A.   I don't recall.

4   Q.   Okay.  Give me your best judgment as to when that

5        was.

6   A.   Eight or nine years ago.

7   Q.   And where was this?

8   A.   Spring Valley, Wisconsin, I believe.

9   Q.   And what county is that?

10  A.   Pierce.

11  Q.   And what happened as a result of that warrant?

12  A.   Went to jail.

13  Q.   Do you remember what the total value of the bad

14       checks was?

15  A.   No, I do not.

16  Q.   Okay.  How much time did you serve in jail?

17  A.   I was bailed out immediately.

18  Q.   Do you remember who posted bail for you?

19  A.   Rose Coleman.

20  Q.   Is that a friend of yours?

21  A.   Grandmother.

22  Q.   Grandmother.  Okay.  And did you have a -- go to

23       trial on that?

24  A.   No.

25  Q.   Did you plead guilty?

1    A.    Just paid them immediately.

2    Q.    You paid whoever you had written the check to

3          immediately?

4    A.    Um-hum.

5    Q.    Okay.  Did you know at the time you wrote the check

6          that it was a bad check?

7    A.    No.

8    Q.    Have you ever been arrested any other times?

9    A.    No.

10   Q.    Have you ever been convicted of any other crimes?

11   A.    No.

12   Q.    Have you ever been convicted of a felony?

13   A.    No.

14   Q.    Have you ever sued anyone?

15   A.    Yes.

16   Q.    Okay.  Tell me about that.  First of all, how many

17         were there?

18   A.    Twice.

19   Q.    Two lawsuits?

20   A.    Correct.

21   Q.    Were you the plaintiff?

22   A.    Correct.

23   Q.    Okay.  What was the first one?

24   A.    I sued a bill collection agency.

25   Q.    And do you remember the style of that case?

    1    A.    I have no idea.

    2    Q.    Do you remember who it was you sued?

    3    A.    No, I do not.

    4    Q.    Do you remember when it was?

    5    A.    It's been a few years.

    6    Q.    Okay.  Was it more than ten years ago?

    7    A.    No.

    8    Q.    More than five years ago?

    9    A.    I would say between five to seven years ago.

   10    Q.    And you don't remember who it was you sued?

   11    A.    I don't recall the name of the company.

   12    Q.    Do you recall who your lawyer was?

   13    A.    Yes, I do.

   14    Q.    Who is that?

   15    A.    Tommy Lyons, Jr.

   16    Q.    Do you know where that suit was filed?

   17    A.    No, I do not.

   18    Q.    Was it in Minnesota?

   19    A.    I don't know if it was Wisconsin or Minnesota.

   20    Q.    Would it have been either one or the other?

   21    A.    I believe so.

   22    Q.    And what were the allegations of that lawsuit?

   23    A.    Unlawful collections.

   24    Q.    Did you sue them -- at the time you sued them, were

   25          you, yourself, a debt collector?

1    A.    Yes.

2    Q.    Do you know who you were employed with at the time?

3    A.    I believe Alliance One.

4    Q.    And what was it that you were alleging in that

5          case?  I know unlawful collections, but what

6          specifically was the conduct that lead to those

7          allegations?

8    A.    I'm not allowed to discuss that case.

9    Q.    Well, the Complaint -- is the Complaint public

10         record?

11   A.    I don't know per -- I'm not allowed to discuss the

12         case.

13   Q.    You're not allowed to discuss any aspect of the

14         case?

15   A.    As far as I'm aware, no.

16   Q.    Okay.  Did that case result in a settlement?

17   A.    Yes.

18   Q.    Was your deposition taken in that case?

19   A.    No.

20   Q.    Did you give any kind of sworn testimony?

21   A.    Yes -- no.  Wait.

22   Q.    Did you answer written discovery?

23   A.    Yes.

24   Q.    Okay.  Where is Tommy Lyons, Jr., located?

25   A.    Vadnais Heights.  I had to think.  Vadnais Heights.

| | | |
|---|---|---|
| 1 | Q. | Dennis Heights? |
| 2 | A. | Vadnais Heights. |
| 3 | Q. | Can you spell that for me? |
| 4 | A. | V-A-D-N-I-A-S (sic) Heights. |
| 5 | Q. | Is that where his office is? |
| 6 | A. | I believe so still. |
| 7 | Q. | Is that here in Minneapolis? |
| 8 | A. | Minnesota, yeah, St. Paul. |
| 9 | Q. | Okay.  And what was the other suit? |
| 10 | A. | Another collection agency. |
| 11 | Q. | The first suit that you were sued on, were they |
| 12 | | collecting a debt that you actually owed? |
| 13 | A. | Technically. |
| 14 | Q. | Was it on a credit card? |
| 15 | A. | No. |
| 16 | Q. | Okay.  What was the debt that you technically owed? |
| 17 | A. | I don't believe I'm able to disclose that. |
| 18 | Q. | When was the second lawsuit? |
| 19 | A. | Two to -- two years ago.  Two to three years ago |
| 20 | | perhaps -- three years -- between two to three |
| 21 | | years ago. |
| 22 | Q. | Okay.  And who was your lawyer in that case? |
| 23 | A. | Tommy Lyons. |
| 24 | Q. | And who did you sue in that case? |
| 25 | A. | I don't believe I'm allowed to disclose that |

NANCY BRITTON                    19

```
 1         either.

 2   Q.    You're not -- it's your understanding that

 3         according to the terms of the settlement you're not

 4         even allowed to say who it was you sued?

 5   A.    I don't know whether I am or not.

 6   Q.    Okay.

 7   A.    So I'd prefer not to take a chance.

 8   Q.    Okay.  Do you know who it is?

 9   A.    Yes.

10   Q.    And what were the claims of that lawsuit?

11   A.    Unlawful collection.

12   Q.    And what actions made up the unlawful collections?

13   A.    I don't know if I can answer that.

14   Q.    Okay.  Here's what I'd like to do:  Can we take a

15         break and you call your attorney and ask him about

16         the terms of the settlement?  Because most all

17         lawsuits that are filed, unless they involve a

18         minor, are public record and so the allegations

19         would be in the lawsuit itself.  Most settlements

20         that have confidentiality are typically only as to

21         the terms of the settlement.  So do you know how to

22         get in touch with your attorney?

23   A.    I don't have his number on hand, no.

24               MR. HERRING:  Okay.  Is there a -- let's

25         take a short break and get a phone book.
```

```
 1                    MR. SCOTT:  Stan, why -- why don't we
 2        just move on and -- and we'll look into this and
 3        see what she can disclose or not and we can revisit
 4        it later.
 5                    MR. HERRING:  Well, here's the problem:
 6        This is my chance to depose her.  So, I mean, are
 7        you going to pay for me to fly back --
 8                    MR. SCOTT:  No.  If we need to fill in
 9        details, that's probably something you can handle
10        on the phone, don't you think?
11                    MR. HERRING:  By a phone deposition?
12                    MR. SCOTT:  Yeah.  I mean, if you're just
13        filling in some details, I mean, you're going to --
14                    MR. HERRING:  Okay.  So you're saying
15        that if it's something I want to ask questions on,
16        you'll agree to put her up a second time?
17                    MR. SCOTT:  Yeah.  We'll put her back up
18        by phone if we need to fill in some details.
19   Q.   (By Mr. Herring) All right.  And did you give
20        testimony in that case?
21   A.   Written.
22   Q.   Okay.  You were not deposed?
23   A.   No.
24   Q.   Have you ever given a deposition?
25   A.   No.
```

```
 1   Q.   Have you ever given testimony in court?

 2   A.   Yes.

 3   Q.   And what was that related to?

 4   A.   Restraining Order.

 5   Q.   Okay.  And when was that?

 6   A.   Five, six years ago.

 7   Q.   Okay.  In what county and what city?

 8   A.   I believe it was Pierce County, Ellsworth,

 9        Wisconsin.

10   Q.   Did you say Ellsworth?

11   A.   Yes.

12   Q.   And who is the Restraining Order against?

13   A.   Troy Peterson.

14   Q.   And I don't want you to go into great detail; but

15        just generally, why was it that you had to get a

16        Restraining Order?

17   A.   Harassment.

18   Q.   Okay.  I mean, was he a boyfriend or a --

19   A.   Yes.

20   Q.   -- husband?  Okay.  Have you given testimony in

21        court any other time?

22   A.   Yes.

23   Q.   Okay.  When else?

24   A.   Restraining Order.  Probably a year-and-a-half, two

25        years ago.
```

```
 1   Q.   Okay.  What city and county?

 2   A.   I believe it's St. Croix, Hudson, Wisconsin.

 3   Q.   Okay.  And who is that against?

 4   A.   Keomani Vang.

 5   Q.   Is that another boyfriend?

 6   A.   No.

 7   Q.   Who is that?

 8   A.   The girlfriend of my child's father.

 9   Q.   Girlfriend of your child's father.  All right.

10        Have you ever given any other testimony in court?

11   A.   No.  Not that I recall.

12   Q.   Have you ever been sued?

13   A.   Yes.

14   Q.   And when was that?

15   A.   Years ago.

16   Q.   More than ten?

17   A.   I believe so.

18   Q.   Okay.

19   A.   Perhaps.  Between 8 to 12 years ago.

20   Q.   Okay.  And what were you sued for?

21   A.   Not paying a bill.

22   Q.   Do you recall who you were sued by?

23   A.   Hiawatha National Bank, I believe.

24   Q.   And was there a trial?

25   A.   Huh-uh.
```

```
 1   Q.   Did you pay the bill after they sued you?

 2   A.   Years later.

 3   Q.   Did y'all reach a settlement in that case?

 4   A.   Huh-uh.  No.

 5   Q.   Did it stay on the trial docket until you paid the

 6        bill?

 7   A.   I believe so.

 8   Q.   Did you have a lawyer in that case?

 9   A.   No.

10   Q.   Was that in small claims court?

11   A.   I believe so.

12   Q.   Do you know how much it was they sued you over?

13   A.   I don't recall.

14   Q.   Okay.  And where was that?

15   A.   Pierce or St. Croix County.

16   Q.   Okay.  Is there any other lawsuits filed against

17        you?

18   A.   I had another judgment against me.

19   Q.   Okay.  And when was that?

20   A.   Again, 8 to 12 years ago.

21   Q.   Okay.  Was that in Pierce or St. Croix County?

22   A.   Yep.

23   Q.   Was that for a debt?

24   A.   Yep.

25   Q.   And who was it that sued you in that case?
```

1    A.    Sunshine Daycare.

2    Q.    How much was it that they sued you for?

3    A.    I don't recall.

4    Q.    And did you pay that judgment off?

5    A.    Yes.

6    Q.    Okay.  Any other lawsuits against you?

7    A.    I don't believe so.

8    Q.    When you were hired by I.C. Systems, did you have

9          to disclose all this information to them?

10   A.    I believe so.

11   Q.    And did you discuss that with them after that --

12         during the interview?

13   A.    I don't know if there was a time frame or -- I

14         don't know.

15   Q.    Okay.  How long have you been licensed -- licensed

16         as a debt collector in Minnesota?

17   A.    Since '01.

18   Q.    Have you ever had your license revoked or

19         suspended?

20   A.    Absolutely not.

21   Q.    Have you ever been the subject of an enforcement

22         action by the State of Minnesota?

23   A.    No.

24   Q.    Or any department of the State of Minnesota?

25   A.    Nope.

Chaser Court Reporting <><><> (612) 986-5960

```
 1   Q.   Have you ever had to appear and give testimony

 2        before any commission related to debt collection

 3        activities in the State of Minnesota?

 4   A.   State that question again, please.

 5   Q.   Have you ever had to appear before any state

 6        commission in Minnesota to give testimony related

 7        to debt collection activities?

 8   A.   No.

 9   Q.   Have you ever had to answer a Complaint that was

10        filed against you?

11   A.   No.

12   Q.   Okay.

13   A.   Outside of this, obviously.

14   Q.   What about any other state?

15   A.   No.

16   Q.   Are you licensed to collect debt through any other

17        state?

18   A.   No.

19   Q.   Tell me, when you were hired by I.C. Systems, what

20        was your training in regards to documenting a

21        collection call?

22   A.   What aspect?

23   Q.   Well, when you'd take a call or make a call, what

24        are the kinds of things that you were supposed to

25        document in regards to the conversation?
```

```
 1   A.   Where you're calling, result of the call, that you

 2        verified their information, verified the

 3        Mini Miranda, reason for delinquency, source of

 4        income, outgoing calls.

 5   Q.   Were you trained that if you talked to -- attempted

 6        to contact the debtor and spoke with a third party

 7        that you were supposed to document that?

 8   A.   (No response.)

 9   Q.   Do you know what I mean by "third party"?

10   A.   Yes.  I know what you mean by "third party."  I

11        guess re-ask the question.

12   Q.   Were you trained that if you attempted to contact

13        the debtor at a number --

14   A.   Um-hum.

15   Q.   -- and spoke with a third party, in other words,

16        somebody other than the debtor answered the phone

17        and you spoke with that person, were you trained

18        that you were supposed to document that fact?

19   A.   Absolutely.

20   Q.   Okay.  And is there a particular notation that you

21        were supposed to put in the file to document that?

22        I mean, is there an abbreviation or a code or

23        anything like that?

24   A.   You would have your action and your result code.

25   Q.   And what's the action or result code for talking to
```

| 1 | | somebody other than the debtor? |
|---|---|---|
| 2 | A. | It depends on the call. I mean, there's an action |
| 3 | | and result code with follow-up documentation, if |
| 4 | | needed. |
| 5 | Q. | Okay. Tell me what you mean by "action and result |
| 6 | | code." |
| 7 | A. | The first two letters of the documentation should |
| 8 | | be the action code. The second two letters should |
| 9 | | be the result code. It's a four letter code. |
| 10 | Q. | Okay. Can you -- looking -- well, let me actually |
| 11 | | give you the actual exhibit. Is that code |
| 12 | | different for the TSYS System versus the ARMS |
| 13 | | system? |
| 14 | A. | Sometimes, yes. |
| 15 | Q. | I guess looking at the collection notes -- and |
| 16 | | there are three or four different sets -- will you |
| 17 | | give me an example of what you're talking about? |
| 18 | A. | Right here (indicating). |
| 19 | Q. | Okay. |
| 20 | | MR. SCOTT: Which page are you looking |
| 21 | | at? |
| 22 | | THE WITNESS: I am -- |
| 23 | | MR. SCOTT: Look at -- look at the Bates |
| 24 | | Number down at the bottom of the page. |
| 25 | | THE WITNESS: 197, 0197. |

```
 1                    MR. SCOTT:  All right.  Thanks.
 2    Q.   (By Mr. Herring) Okay.  What line are you looking
 3         at?
 4    A.   I am looking at one, two, three, four -- the fifth
 5         line down.
 6    Q.   Okay.  And it's dated 01-18-09, time, 14:02:33.  Is
 7         that the line you're talking about?
 8    A.   Um-hum.
 9    Q.   You need to answer out loud.
10    A.   Oh, I apologize.  Yes.
11    Q.   Okay.  Tell me what code you're talking about.
12    A.   The first four letters denotes action and result
13         code.
14    Q.   Okay.  So "TORP"?
15    A.   Um-hum.
16    Q.   And that's required to be on -- that's required to
17         be in the documentation of every conversation that
18         you would note in these records; is that correct?
19    A.   Correct.
20    Q.   And so the first two would be telephone out?
21    A.   Correct.  Telephone --
22    Q.   It's ARMS.  "TO" -- whatever it is, it's telephone
23         out or telephone something.  And then "RP."  So the
24         action is telephone out and the RP is refusal to
25         pay?
```

```
 1   A.   Um-hum.

 2   Q.   Okay.  And if you telephoned out and ended up

 3        speaking with a third party, according to your

 4        training, you would be required to note that;

 5        correct?

 6   A.   Correct.

 7   Q.   And what would be the code for that?

 8   A.   It would be noted after that code.

 9   Q.   Okay.  Would it be -- if the third party didn't say

10        anything about payment or anything like that, would

11        it be noted as refusal to pay?

12                  MR. SCOTT:  Object to the form of the

13        question.  Go ahead and answer if you understand

14        the question.

15                  THE WITNESS:  I'm sorry.  Repeat the

16        question.

17                  MR. HERRING:  He's going to object to the

18        way I ask questions because he thinks they're

19        confusing or doesn't like the question or doesn't

20        like the way I asked it; but if you understand it,

21        you need to answer it.

22                  THE WITNESS:  Okay.

23                  MR. HERRING:  Okay.  If he thinks I'm

24        getting into something privileged, like what y'all

25        discussed, he'll advise you not to answer --
```

```
 1                      THE WITNESS:  Okay.
 2                      MR. HERRING:  -- and then we'll go from
 3           there.  But I guess my question -- what I was
 4           trying to figure out was is if you called a number
 5           for a debtor and spoke with the third party, would
 6           it ever -- would that action/result code ever
 7           result in a refusal to pay?
 8                      MR. SCOTT:  Object to the form.
 9    Q.     (By Mr. Herring) I mean, is that a proper code to
10           put in if you talk to a third party and don't talk
11           to the debtor?
12    A.     In some -- some instances, yes.
13    Q.     Okay.  And if you talk to a third party, is there
14           some abbreviation that y'all normally have for
15           that?
16    A.     It would be noted after the action/result code.
17    Q.     Okay.  But what I'm saying is would it be, like,
18           you know, discuss TP, third party, or spoke TP,
19           third party; or is there some notation of a third
20           party contact; or would you just write out third
21           party or person not the debtor or a parent or a
22           neighbor or something like that?
23                      MR. SCOTT:  Object to the form of the
24           question.
25                      THE WITNESS:  Each -- I mean, it's --  as
```

```
 1          long as it's documented, I don't believe that
 2          there's a specific set in stone...
 3    Q.    (By Mr. Herring) Way to document that?
 4    A.    Correct.
 5    Q.    Is that what you're saying?
 6    A.    (Witness nods head.)
 7    Q.    Okay.  Is that a yes?
 8    A.    Yes.
 9    Q.    All right.  What was your training in regards to
10          whether or not you can discuss a debt or the
11          collection of a debt with someone other than the
12          debtor you're trying to contact?
13    A.    There's continually training on that area.
14    Q.    Okay.  Well, tell me, what was that training?  What
15          did they tell you you could do or not do?
16    A.    As far as talking to a third party?
17    Q.    Correct.
18    A.    Not allowed to do so.  On -- obviously, unless they
19          are represented -- the third party is an attorney,
20          the third party is a spouse and it states that it's
21          allowed.
22    Q.    What about if the third party is a parent?
23    A.    Not unless the person is under the age of 17 in
24          certain states.
25    Q.    What about in regards to obtaining location
```

1        information?

2    A.  What is your direct question?

3    Q.  What are you allowed to discuss with a third party

4        in regards to obtaining location information?

5        What's your understanding?

6    A.  As far as discussing the account, nothing.

7    Q.  Okay.  So if you call and talk to a third party,

8        are you allowed to ask for location information for

9        the debtor?

10   A.  Yes.

11   Q.  In doing that, are you allowed to disclose that

12       you're a debt collector?

13   A.  No.

14   Q.  Are you allowed to disclose that you're collecting

15       a debt?

16   A.  No.

17   Q.  Are you allowed to disclose that the debtor owes --

18       owes money to you or to somebody else?

19   A.  No.

20   Q.  If you have location information for the debtor,

21       are you allowed to contact a third party to try to

22       obtain location information?

23   A.  If you -- can you repeat the question again?

24   Q.  If you already have location information for the

25       debtor that --

| 1  | A. | Correct. |
| 2  | Q. | -- that you believe is accurate, are you allowed to |
| 3  |    | contact a third party to try to obtain further |
| 4  |    | location information? |
| 5  | A. | If you believe it to be correct? |
| 6  | Q. | Yes. |
| 7  | A. | No. |
| 8  | Q. | Okay.  Are you allowed to ask a third party to |
| 9  |    | deliver a message to the debtor? |
| 10 | A. | In certain states, yes. |
| 11 | Q. | Okay.  What about in Alabama? |
| 12 | A. | In Alabama, yes. |
| 13 | Q. | Okay.  And under what circumstances can you do |
| 14 |    | that? |
| 15 | A. | I don't understand your question. |
| 16 | Q. | Well, are there certain circumstances that you |
| 17 |    | could not ask a third party to deliver a message to |
| 18 |    | a debtor? |
| 19 | A. | If you've already previously talked to the debtor |
| 20 |    | that day. |
| 21 | Q. | Okay.  Then, under those circumstances, you could |
| 22 |    | not call back and ask the third party to deliver a |
| 23 |    | message to the debtor? |
| 24 | A. | Correct.  Correct.  Yes. |
| 25 | Q. | Are you allowed to ever ask a third party to ask |

```
 1          the debtor to pay their debt?

 2    A.    No.

 3    Q.    Okay.  Are you allowed to call somebody's neighbor

 4          and ask them to get a message to a debtor?

 5    A.    In certain states, yes.

 6    Q.    What about in Alabama?

 7    A.    Yes.

 8    Q.    Okay.  And how do you know that?

 9    A.    Continual training on laws.

10    Q.    Do you recall where you saw that information?

11    A.    No.  I do not directly recall.

12    Q.    Do you recall a document that said that?

13    A.    I can't say yes or no.

14    Q.    Okay.  This -- the training that you received, the

15          ongoing training, do you receive materials as a

16          result of that?

17    A.    Yes.

18    Q.    Do you keep those?

19    A.    Yes.

20    Q.    Okay.  Do you still have those?

21    A.    They're hanging up at our desks.

22    Q.    Okay.  Would -- the statement that in Alabama

23          you're allowed to ask a neighbor to deliver a

24          message to a debtor, would that be in one of

25          those -- in some of those materials?
```

1                    MR. SCOTT:  Object to the form of the

2          question.

3                    THE WITNESS:  Not that direct statement,

4          no.

5     Q.   (By Mr. Herring) Okay.  How -- would it appear in

6          those materials in some other form?

7     A.   The assumption, yes.

8     Q.   What do you mean "the assumption"?

9     A.   If it's not denoted as not allowed to leave

10         third-party messages, then, yes, you are able to do

11         so.

12    Q.   Okay.  Would you be able to go and look and find

13         that and provide that to your lawyer?

14    A.   Yes.

15    Q.   Okay.  Would you do that after this deposition?

16                   MR. SCOTT:  Yes.

17                   THE WITNESS:  Yes.

18                   MR. HERRING:  I need to take, like, a

19         two-minute break.  I'm sorry.

20                   MR. SCOTT:  All right.

21                   (Recess from 12:29 p.m. to 12:34 p.m.)

22    Q.   (By Mr. Herring) If a debtor in the course of a

23         call asks you to quit calling them or not to call

24         back, according to your training, what are you

25         supposed to do in response to that?

```
 1    A.    It depends on the state.
 2    Q.    In the State of Alabama, what are you supposed to
 3          do?
 4    A.    The State of Alabama, explain to them that is not
 5          the proper way to cease.
 6    Q.    What are you supposed to say?
 7    A.    That's it.
 8    Q.    Are you supposed to advise them on the proper way
 9          to cease?
10    A.    No.
11    Q.    So you don't -- you're not required to say, "You
12          need to put that in writing to me"?
13    A.    Alabama, no.
14    Q.    Okay.  Is there a state law in Alabama that you're
15          aware of that governs debt collection activity?
16    A.    Can I get my cheat sheet?  No.
17    Q.    Do you have a sheet that tells you what the various
18          state's laws are?
19    A.    Easily accessible at all times.
20    Q.    Okay.  Is that a hard copy, or is that on the
21          computer?
22    A.    On our computer, it will flash on the account brief
23          notes; and then you have your hard copy as well.
24                MR. HERRING:  Okay.  John, can I get a
25          copy of that?
```

```
 1                    MR. SCOTT:  We will look into it.
 2                    MR. HERRING:  You're shocked that I asked
 3          that; aren't you?
 4                    MR. SCOTT:  My list is getting longer and
 5          longer.
 6     Q.   (By Mr. Herring) Okay.  Did -- who's your
 7          supervisor, by the way?
 8     A.   Rod -- at this time, Jamie Lebakken.
 9     Q.   Okay.  At the time you were collecting on the Hall
10          account, who was your supervisor?
11     A.   Rod Volkers.
12     Q.   Okay.  What did Rod -- did Rod ever train you or
13          talk to you about what you were supposed to do in
14          regards to when a debtor says, "Please don't call
15          me" or asks you to stop calling?
16     A.   I don't know if he did specifically.  It's
17          continual training.
18     Q.   Okay.  Who provided you continual training?
19     A.   We have semi-annuals and training classes with
20          our -- I think it would be our training department.
21     Q.   Okay.  Did Rod ever train you?
22     A.   On -- on different things, yeah.
23     Q.   Okay.  Was that normally during the course of a
24          call or after a call if he heard something that
25          concerned him?
```

```
 1   A.   Yes.
 2   Q.   Okay.  And did -- have you ever been disciplined
 3        or written up while you were employed with
 4        I.C. Systems for collection activity?
 5   A.   No.
 6   Q.   What about at any other collection firm that you've
 7        worked for?
 8   A.   No.
 9   Q.   Okay.  Have you ever had to be coached by Rod in
10        regards to any of your collection activity?
11   A.   I'm always getting coached to make sure that
12        everything is perfect.
13   Q.   Okay.  Is that the goal at I.C. Systems, for
14        everything to be perfect?
15   A.   That would be ideal and the goal for every company,
16        I believe.
17   Q.   Okay.  And tell me how it is you would define that
18        goal of being perfect in collecting debt.
19   A.   That all laws are followed, an arrangement is -- is
20        met, negotiation is done, money is received on the
21        account, the account is taken care of.
22   Q.   Okay.  At the time of -- that you were collecting
23        on Ms. Hall's account, how much were you being
24        paid?
25   A.   $15.45 an hour.
```

```
 1   Q.   And did you have any kind of bonus structure in
 2        place at that time?
 3   A.   Yes.
 4   Q.   And what was that?
 5   A.   It was a commission structure based on dollars
 6        collected.
 7   Q.   And by "dollars collected," do you mean actual
 8        dollars received?
 9   A.   Dollars collected from debtors, yes.
10   Q.   That doesn't include, though, promises?
11   A.   Correct.
12   Q.   I mean, if a debtor promised to pay $200 and
13        didn't, you wouldn't get a commission --
14   A.   Yes.
15   Q.   -- on just the amount promised?
16   A.   Correct.
17   Q.   Okay.  And tell me how that worked, that
18        commission.
19   A.   You had a goal.  If you hit the goal or above the
20        goal, you were paid out a certain percentage.
21   Q.   Okay.  And what was the goal?
22   A.   My goal for -- my goals vary every month.
23   Q.   Okay.  Do you recall in October 2009 what your
24        goals were?
25   A.   October --
```

```
 1   Q.   I'm sorry.  2008.

 2                    MR. SCOTT:  2008, yeah.

 3                    THE WITNESS:  Is that when I took her

 4             payment?

 5                    MR. HERRING:  No.  That's when

 6             I.C. Systems received this account.

 7                    THE WITNESS:  Okay.  I don't recall.

 8   Q.   (By Mr. Herring) Do you know what it was in

 9             November 2008?

10   A.   My goals fluctuate and change sometimes on a

11             monthly basis so no.

12   Q.   Okay.  Can you give me a -- a range of what your

13             goals are?

14   A.   Anywhere between -- I believe 20 would have been

15             the lowest that a goal would be up to, I believe,

16             my goal has been as high as 55, 60, maybe 65.

17   Q.   Okay.  And the way that works is if you reach that

18             goal -- for instance, if you collect 20,000 when

19             it's set at 20,000, what happens?

20   A.   That's when you have earned your commission.

21   Q.   Okay.  And what percentage is your commission of

22             what you collect?

23   A.   Each month would be a little different.  Our -- our

24             commission structure changes as well.

25   Q.   Okay.  Can you give me a range?
```

```
 1   A.   I would, for example, the last time that I can
 2        recall, take dollars earned times the percentage
 3        that we received from the client and then multiply
 4        that by the percentage that I earned for the month
 5        and that would equal my commission.
 6   Q.   Okay.  So dollars received --
 7   A.   Um-hum.
 8   Q.   -- times percent received from client.  Is that the
 9        percent of the total debt?
10   A.   That's whatever the client is paying us in fees on
11        that particular month, that particular -- that
12        particular month is what they were paying for fees.
13   Q.   Okay.  So, for example, if a client owed -- I mean,
14        if a -- now, when you say "client," who are you
15        referring to?
16   A.   Target.
17   Q.   Okay.  So dollars earned times percent received
18        from Target?
19   A.   What they're paying, the percentage of fees they
20        are paying.
21   Q.   And tell me what that means.  I don't understand
22        that.
23   A.   They pay us a percentage of what they collect and
24        it's called "fees."
25   Q.   Okay.  And you multiply that times the percentage
```

```
 1            you earn.  Is that your monthly base wage?
 2    A.      No.  What I earned for the month could be teamwise,
 3            did we earn a 3.5 percent payout, did we earn a
 4            3 percent payout, depending on performance,
 5            depending on commission structure that changed.
 6    Q.      Do you recall whether in -- well, let me ask it
 7            this way:  Since January -- do you get that
 8            commission paid on a monthly basis to you or that
 9            bonus?
10    A.      Yes, if you earn it.
11    Q.      Okay.  Did you receive a bonus for the month of
12            October of this year?  That would be last month.
13    A.      Have I received it yet?
14    Q.      Are you going to receive one?
15    A.      Yes.
16    Q.      Okay.  And how much is that?
17    A.      For -- October's commission was $1,000.
18    Q.      Did you receive one in September?
19    A.      Yes.
20    Q.      Do you recall what that was?
21    A.      $3,138.
22    Q.      Do you recall what it was in August?
23    A.      Around 2,200.  That's of '09; correct?
24    Q.      Correct.  I guess I assume you'd be able to
25            remember going back better than you would if I
```

```
 1          started last October; right?
 2    A.    Right.
 3    Q.    Do you know what it was in July?
 4    A.    That's --
 5    Q.    Is that --
 6    A.    That's probably as far as I can go.
 7    Q.    Okay.  Do you know what you received in total
 8          bonuses for 2008?
 9    A.    2008?
10    Q.    For the entire year.
11    A.    I averaged between 15 to $1,600 per month.
12    Q.    Okay.  Was there ever a month that you did not get
13          a bonus in 2008?
14    A.    I -- I believe I did not bonus in -- I don't recall
15          what month, but I believe there was one month I did
16          not bonus in in 2008.
17    Q.    Do you remember if it was in the last quarter of
18          2008?
19    A.    I believe that it was in the beginning of the year.
20          I don't recall the month.
21    Q.    Okay.  Now, the bonuses that you get, is that -- do
22          you rely on those each month in order to make ends
23          meet and to be able to pay your bills?
24    A.    Yeah.  Yes.
25    Q.    Okay.  I mean, if you don't get the bonus, do you
```

```
 1          have a hard time paying your bills?

 2   A.    No.

 3   Q.    Okay.  You're able to make it without the bonus?

 4   A.    Yes.

 5   Q.    Do you recall if you got a bonus in December 2008?

 6   A.    2008?

 7   Q.    Yes.

 8   A.    I -- well, yeah.  I would have, yes.

 9   Q.    Okay.  All right.  I want you to look at the

10          collection logs.  Let me ask you this:  Did you

11          enter data on the TSYS system?

12   A.    Yes.

13   Q.    Okay.  And on the ARMS System as well?

14   A.    Yes.

15   Q.    Okay.  I guess we'll start with the TSYS System.

16          Will you go through there and -- first of all, what

17          is your operator code on the TSYS system?

18   A.    ZE -- ZE7863.

19   Q.    ZE7863?

20   A.    I believe so.

21   Q.    Okay.  So looking at Page 183, does that match up

22          with what you recall?

23   A.    Yes.

24   Q.    Okay.  And that's January the 2nd.  Will you look

25          at the collection activity prior to January the 2nd
```

| | | |
|---|---|---|
| 1 | | and let me know if -- if it appears that you |
| 2 | | collected on this account?  I think the first one I |
| 3 | | see is on Document 188.  There's a call on 10-20 -- |
| 4 | | what's the date on that?  10-20-08? |
| 5 | A. | What are you looking for?  Yes.  I see what you're |
| 6 | | looking at, 10-20-08, ZE7863, that is me. |
| 7 | Q. | Okay.  Do you recall that -- that phone call, |
| 8 | | entering this data? |
| 9 | A. | Do I recall it specifically? |
| 10 | Q. | Yes. |
| 11 | A. | No. |
| 12 | Q. | Okay.  What -- and can you tell from this what you |
| 13 | | did or what happened on that call? |
| 14 | A. | The phone number was changed. |
| 15 | Q. | Okay.  Would you have changed that, or was that |
| 16 | | changed by the system? |
| 17 | A. | That would have been changed by me. |
| 18 | Q. | Okay.  And you don't recall how it was you got that |
| 19 | | phone number, do you? |
| 20 | A. | That number was on there, and I changed it to |
| 21 | | taking out the area code. |
| 22 | Q. | Okay.  To show it as a bad number? |
| 23 | A. | Correct. |
| 24 | Q. | Okay.  What was the next activity you had on this |
| 25 | | account? |

1    A.   That would be 11-4 of '08.

2    Q.   Okay.  And do you recall -- do you have an

3         independent memory of this phone call?

4    A.   Just off my notes.

5    Q.   Okay.  But without the notes, do you remember the

6         phone call itself, what was said?

7    A.   No.

8    Q.   Okay.  How many calls were you making a day during

9         this time period?

10   A.   Between 100 to 150 maybe.

11   Q.   Okay.  And how many debtors do you think you were

12        speaking with on a daily basis during this time

13        period?

14   A.   I wouldn't even have a good guess.  I --

15   Q.   Do you think it's a half or a third?

16   A.   Oh, there's no way that it was half.  Maybe

17        anywhere between 10 to 20 contacts a day maybe.

18   Q.   Okay.  Okay.  What was -- and what happened on that

19        call?

20   A.   She was unable to pay.  I offered her one, two,

21        three options.  Three options.

22   Q.   Okay.  Is one of those options that you offered her

23        the hardship plan that Target does?

24   A.   All three of them are hardship programs.

25   Q.   Are those hardship programs within I.C. Systems or

```
 1          hardship programs that would kick the account back
 2          to Target?
 3     A.   All three of these options that I offered her would
 4          remove her from our office.
 5     Q.   Okay.  And what would happen -- if she gets removed
 6          from your office and makes payments, would you
 7          receive a commission based on that or would those
 8          payments count toward your commission?
 9     A.   Payments received do count towards my commission.
10     Q.   So whether she stays in your office or not, you
11          still get a commission on that; is that what you're
12          saying?
13     A.   If I hit my goal, correct.
14     Q.   Okay.  And is that, as you understand it,
15          regardless of what contract y'all are under with
16          Target or not?
17               MR. SCOTT:  Object to the form of the
18          question.  If you know.
19               THE WITNESS:  I don't understand the
20          question.
21     Q.   (By Mr. Herring) Do you have any understanding
22          about how Target compensates I.C. Systems for the
23          people that collect on its --
24     A.   No.
25     Q.   Okay.  And so you're not aware that -- whether or
```

```
 1          not you receive a payment -- if an account gets
 2          kicked back to Target may depend on what -- on what
 3          contract is in place at that time; is that correct?
 4   A.     I don't really understand your question.
 5   Q.     Okay.
 6   A.     I don't know the contract between my company and
 7          Target, no.
 8   Q.     Okay.  And you have no knowledge of how that
 9          affects your commission?
10   A.     If we -- if we do better in -- I don't even -- our
11          commission, we earn a higher percentage per our
12          performance in buckets.
13   Q.     Okay.  What was the next time you had any
14          interaction with this account?
15   A.     On January 2, 2009.
16   Q.     Okay.  So you didn't see or try to collect on this
17          account prior to January 2, 2009?
18   A.     No.
19                    MR. SCOTT:  Other than what she's
20          obviously testified to.
21                    MR. HERRING:  Yeah.  Yeah.  I'm sorry.
22   Q.     (By Mr. Herring) Okay.  Can you tell if this was a
23          call that you made or that the dialer made or if it
24          was an incoming call?
25   A.     She called us.
```

```
 1   Q.   How can you tell that?

 2   A.   Page 181.

 3   Q.   All right.

 4   A.   On the "5:21, Action/Result Code, Action, Primary

 5        Guest Telephoned."  That means she contacted me.

 6   Q.   Okay.  And what was the result?

 7   A.   Payment was set up online.

 8   Q.   All right.  And what were the terms of that

 9        payment?

10   A.   Can you define what you mean by "terms"?

11   Q.   Well, I want you to tell me all the terms that were

12        documented on -- regarding that payment.

13   A.   Okay.  She would set up the 173.  It would be dated

14        for the 14th.  That at that point was her minimum

15        payment to get out of our office, and she'll go

16        back to Target at -- which she could set up a

17        hardship with them.

18   Q.   Okay.  Where in the note does it say that that's

19        the minimum payment to get out of your office?

20   A.   It does not say that on these notes.

21   Q.   Okay.  Where does it say that she could go back and

22        get set up on a hardship plan with Target?

23   A.   It -- I did not document that on this entry note.

24   Q.   Okay.  How do you know that that was a part of the

25        terms of the agreement?
```

| 1  | A. | Because I already offered her three different -- I |
|----|----|----|
| 2  |    | offered her the three hardship programs this time |
| 3  |    | that I did previously. So she didn't set up the |
| 4  |    | hardship with us. If she wanted to remain out of |
| 5  |    | our office, she was to contact Target to set up a |
| 6  |    | hardship with them. |
| 7  | Q. | Okay. So do you remember this conversation? |
| 8  | A. | Somewhat. |
| 9  | Q. | Okay. So you have some recollection of having this |
| 10 |    | conversation with Ms. Hall? |
| 11 | A. | Somewhat, yes. |
| 12 | Q. | Okay. Tell me about the conversation that you had |
| 13 |    | before this call. |
| 14 | A. | Before this call? |
| 15 | Q. | Yes. |
| 16 | A. | Couldn't. |
| 17 | Q. | Tell me about the conversation that you had after |
| 18 |    | this call. |
| 19 | A. | If you give me a specific name, I would love to do |
| 20 |    | that for you. |
| 21 | Q. | Okay. But you can't tell me as you sit here today? |
| 22 | A. | I can't tell you the next person after this call, |
| 23 |    | no. |
| 24 | Q. | Okay. So if I'd just give you the name of |
| 25 |    | somebody, you believe you might be able to recall |

```
 1        the conversation that you had?

 2   A.   If you gave me the name and my notes, my

 3        documentation, yes, it's very possible.

 4   Q.   And was there anything else about the conversation

 5        that you remember?

 6   A.   About this conversation?

 7   Q.   Correct.

 8   A.   She just started working.  She wanted to commit to

 9        one payment only.  I would have loved to have set

10        the hardship up right then and there.  She didn't

11        know how the new job was going to work.  She didn't

12        know exactly how she was going to get paid.  So we

13        did the minimum payment, and she was going to

14        contact Target because then she would have a better

15        idea of what was going on with her pay.

16   Q.   Okay.  And you remember the details about she

17        didn't know how the job was going to work?

18   A.   She just started her job.

19   Q.   Okay.  Are you assuming that, or do you actually

20        remember that part of the conversation?

21   A.   Your client and I had a very good talk.  She didn't

22        want to set up any additional payments.

23   Q.   Okay.  You remember that it was a good talk?

24   A.   Yes.

25   Q.   Okay.  And do you remember how long that
```

NANCY BRITTON                                    52

```
 1            conversation lasted?
 2    A.      I don't remember exactly, but I know that it was
 3            not a quick call.
 4    Q.      Okay.  And you -- I just want to make sure I'm
 5            clear.
 6    A.      Um-hum.
 7    Q.      You talk to an average of between 10 and 20 people
 8            a day and you work 5 days a week; correct?
 9    A.      Correct.
10    Q.      And so you talk to an average of between 50 and --
11            I'm sorry.  I'm tired.
12    A.      Understandable.
13    Q.      Between 50 and 100 people a week?
14    A.      Some weeks, yes, give or take.
15    Q.      Okay.  And that's week in and week out?
16    A.      Correct.
17    Q.      And given all those people between that
18            conversation and today, you still remember the
19            details of that conversation?
20    A.      Your lawsuit came before today.
21    Q.      Okay.
22    A.      I had to answer to this some time ago.
23    Q.      So --
24    A.      So there was less time between this conversation
25            and the time that I had to go back.
```

```
 1   Q.   That's fine.  That's fair.  Given all the
 2        conversations you had between the time you talked
 3        with her and the time you wrote your statement, you
 4        still remember the details of that conversation?
 5   A.   Some of them, yes.
 6   Q.   Okay.
 7   A.   I take pride in my work, sir.
 8   Q.   All right.  And this is one you remember?
 9             MR. SCOTT:  Asked and answered several
10        times.
11   Q.   (By Mr. Herring) Okay.  You don't remember the
12        other conversations you had with Ms. Hall, but you
13        remember this particular one?
14   A.   Like I stated, bring me my notes and a specific
15        call and it's very possible I may remember those
16        calls as well, sir.
17   Q.   Okay.  Do you recall any other details of the
18        conversation?
19   A.   I -- no, not -- that I can recall right now, no.
20        Not that I can recall.
21   Q.   Okay.  Do you recall whether or not you told
22        Ms. Hall when it was she was supposed to call
23        Target?
24   A.   Immediately after the payment posted.
25   Q.   Okay.  And how do you know that?
```

     1   A.   Because that's what I did on every call.

     2   Q.   Okay.  And did you document any of this in the call

     3        log?

     4   A.   It doesn't seem to be, no.

     5   Q.   Okay.  And is that something you would normally

     6        document or not document?

     7   A.   I -- I don't believe that I documented that on

     8        probably any of the calls prior to her.

     9   Q.   Okay.  So in terms of a -- of an agreement like

    10        that, outside of the payment, you don't normally

    11        document -- or at least prior to her, you didn't

    12        normally document those type of terms?

    13             MR. SCOTT:  I'm going to object to the

    14        form of the question.

    15             THE WITNESS:  Her terms with us were to

    16        set up the payment.  That -- that's what her terms

    17        were with us directly, what she needed to do to

    18        remain on good standings with her account were

    19        terms that she needed to set up with Target

    20        directly.  She needed to take the initiative on her

    21        own to get the terms renegotiated on her file.

    22   Q.   (By Mr. Herring) And do you know whether or not she

    23        contacted Target?

    24   A.   According to the TSYS notes, she did not make a

    25        call to Target.

 1   Q.   Okay.  Will you show me in the TSYS notes where it

 2        says that?

 3   A.   There's no inbound call or calls to her showing

 4        that after the payment was made that she contacted

 5        Target.

 6   Q.   If she contacted Target directly, that would be in

 7        the TSYS notes?

 8   A.   Yes, sir.

 9   Q.   Okay.  And how do you know that?

10   A.   Because we work on their direct system.

11   Q.   Okay.  So the TSYS System documents are supposed to

12        document all collection activity on the Target

13        account, regardless of whether it takes place on

14        the Target side or on the I.C. System's side?

15             MR. SCOTT:  Object to the form of the

16        question.

17   Q.   (By Mr. Herring) Is that correct?

18   A.   All documentation is done on that -- on TSYS --

19        repeat the question to make sure I'm --

20   Q.   Is the TSYS System supposed to document all

21        collection activity or any calls regarding the

22        collection activity on both the Target side and the

23        I.C. System's side?

24   A.   Yes.

25   Q.   Okay.  And how do you know that?

| 1  | A. | It's just known. |
| 2  | Q. | How is it known? |
| 3  | A. | Each person is given an identification number. |
| 4  |    | That identification number will denote which |
| 5  |    | company you're with, and you can see the other |
| 6  |    | documentation at the same time as ours. |
| 7  | Q. | And do you know what the Target policies and |
| 8  |    | procedures are in regards to what their employees |
| 9  |    | are supposed to log into the TSYS System? |
| 10 | A. | No, I do not. |
| 11 | Q. | Okay.  Will you show me in the records -- are you |
| 12 |    | aware of any indication that the account was sent |
| 13 |    | back to Target from I.C. Systems between |
| 14 |    | January 2nd and January the 18th? |
| 15 | A. | Through this WCAD screen, no. |
| 16 | Q. | Okay.  Do you know whether or not it was sent back |
| 17 |    | to Target? |
| 18 | A. | Yes, it was. |
| 19 | Q. | Okay.  How do you know that? |
| 20 | A. | Because when the Complaint came in, we viewed the |
| 21 |    | file and on the IAED screen by pressing "F9," it |
| 22 |    | was able to be viewed that the account did leave |
| 23 |    | our office. |
| 24 | Q. | Between January 2nd and January the 18th? |
| 25 | A. | Oh, I apologize.  Not between -- oh, yes, between |

Chaser Court Reporting <><><> (612) 986-5960

```
 1            those dates.  After the -- after the payment
 2            posted.
 3    Q.      Okay.  So you remember after the lawsuit came in
 4            you were looking at the computer screen?
 5    A.      Correct.
 6    Q.      And who was with you?
 7    A.      I don't believe anybody was with me at that point.
 8    Q.      Okay.  So you were by yourself.  And what screen
 9            were you looking at?
10    A.      IAED, F9.
11    Q.      What is that?
12    A.      I don't have a -- that's -- I don't have a specific
13            name for it.  It holds the transfer codes.  It
14            holds agency codes.  It shows that -- if the
15            account is requeued.  It'd also show on this WCAD
16            screen if it is requeued to remove it from our
17            office.  Those notes update frequently.
18    Q.      Okay.
19    A.      Well --
20    Q.      Is that a permanent record?
21    A.      I don't believe so.
22    Q.      Okay.  But that -- the event that it was
23            documenting -- documenting happened back in January
24            and it was still in that system after we filed our
25            lawsuit?
```

```
 1   A.   When did we get your documentation?

 2   Q.   April the 6th, 2009?

 3   A.   Yes.

 4   Q.   Okay.  And when you viewed that, did you do a print

 5        screen or do anything like that to save that?

 6   A.   No.

 7   Q.   Okay.  Were you looking at that at anybody's

 8        request or on your own?

 9   A.   My own.

10   Q.   Okay.  And it's your testimony that it showed that

11        the account had been sent back to Target back in

12        January?

13   A.   Yes.

14   Q.   Okay.  And that Target had sent it back to

15        I.C. Systems --

16   A.   Yes.

17   Q.   -- during that same period.

18   A.   Yes.

19   Q.   Okay.  And you're -- you're clear about that, that

20        all that happened after the lawsuit?

21   A.   The -- yes.

22   Q.   Okay.  Do you recall whether you ever spoke with

23        Ms. Hall's parents?

24   A.   Don't recall.

25   Q.   If you had, is that something you would have
```

```
 1              documented in the file?

 2     A.       Yes.

 3     Q.       And if you talked to them and didn't document that

 4              in the file, what do you think would happen if

 5              I.C. Systems became aware of that?

 6     A.       I would have disciplinary action taken against me.

 7     Q.       Is that something, as you understand it, you can be

 8              terminated over?

 9     A.       Yes.

10     Q.       And is there a document that you're aware of that

11              trains Target debt -- I.C. System's collectors that

12              collect for Target that discusses the hardship

13              options?

14     A.       Yes.

15     Q.       And when and how you're supposed to offer those?

16     A.       Yes.

17     Q.       Does it discuss whether or not you're supposed to

18              document those in the I.C. System's files?

19                       MR. SCOTT:  Object to the form of the

20              question.

21                       THE WITNESS:  I -- I guess I don't

22              understand your question.  Can you rephrase it,

23              please?

24     Q.       (By Mr. Herring) Does it offer any kind of training

25              on whether or not you are supposed to document if
```

NANCY BRITTON                    60

```
 1          you make that offer to a debtor?
 2                    MR. SCOTT:  Object to the form of the
 3          question.
 4                    THE WITNESS:  If you make the offer, I
 5          believe so, yes.
 6    Q.    (By Mr. Herring) Okay.  And what's the name of that
 7          document?
 8    A.    Quick Source.
 9    Q.    And is that the online resource that --
10    A.    Correct.
11    Q.    Is there any other document that you're aware of?
12    A.    Our -- I went to Quick Source for all my hardship
13          programs.
14    Q.    Okay.  Have you changed the way you document
15          or handle collection calls since you handled
16          Ms. Hall's call?
17    A.    No.
18    Q.    Okay.  Have you been disciplined in any way for any
19          of the -- for the way you collected Ms. Hall's
20          account?
21    A.    No.
22    Q.    Do you know if there's any intent or investigation
23          regarding or with the potential disciplinary action
24          into the way you handled Ms. Hall's account?
25    A.    No.
```

```
 1                    MR. HERRING:  All right.  That's all I
 2         have.
 3                    MR. SCOTT:  No questions.  Read and sign.
 4                    (The deposition concluded at 1:20 p.m.)
 5                    (The original transcript has been
 6         delivered to Mr. Herring; copies to Mr. Herring
 7         and Mr. Scott.)
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1                    C E R T I F I C A T E

2

3          I, Lori L. Okeson, RPR, hereby certify that I am
     qualified as a verbatim shorthand reporter, that I took
4    in stenographic shorthand the deposition under oath of
     **NANCY BRITTON**, at the time and place aforesaid;

5

           That the foregoing transcript is a true and
6    correct, full and complete transcription of the testimony
     of this witness, to the best of my ability;

7

           That the review of the transcript was not waived;

8

           That the cost of the original transcript has been
9    charged to the party who noticed the deposition and that
     all parties who ordered copies have been charged at the
10   same rate for such copies;

11         That I am not a relative or employee of any of the
     parties or a relative or employee of any of the
12   attorneys;

13         That I have no interest, financial or otherwise, in
     this action and have no contract with the parties or
14   attorneys or persons with an interest in this action;

15         Witness my hand and seal this 21st day of November,
     2009, in Cold Spring, Minnesota.

16

17

18

19         _____
                     LORI L. OKESON
20           Registered Professional Reporter

21

22

23         My Commission Expires:  01/31/2010

24

25

1           I, **NANCY BRITTON**, certify and state that I have
    read and examined the typewritten transcript of the
2   deposition of me taken in the matter of Angela M. Hall
    vs. I.C. System, Inc., a Corporation, on November 18,
3   2009, and believe the same to be true and correct, except
    as follows:

4

    Page No.   Line No.             Correction
5

6

7

8

9

10

11

12

13

14

15

16

17   **(CERTIFICATE MUST BE RETURNED BY JANUARY 8, 2010.)**

18

19        Dated this ____ day of _____, 2010.

20

21

22                    _____

23                         **NANCY BRITTON**

24

25   Reported by:  Lori L. Okeson

## $

$1,000 [1] - 42:17
$1,600 [1] - 43:11
$15.45 [1] - 38:25
$200 [1] - 39:12
$3,138 [1] - 42:21

## '

'01 [1] - 24:17
'05 [1] - 4:15
'07 [2] - 6:4, 6:5
'08 [1] - 46:1
'09 [1] - 42:23
'95 [1] - 8:7

## 0

01-18-09 [1] - 28:6
01/31/2010 [1] -
62:23
0197 [1] - 27:25

## 1

1 [1] - 6:11
10 [2] - 46:17, 52:7
10-20 [1] - 45:3
10-20-08 [2] - 45:4,
45:6
100 [2] - 46:10, 52:13
11 [1] - 2:7
11-4 [1] - 46:1
11:40 [1] - 1:18
12 [2] - 22:19, 23:20
12:29 [1] - 35:21
12:34 [1] - 35:21
14:02:33 [1] - 28:6
14th [1] - 49:14
15 [1] - 43:11
150 [1] - 46:10
17 [1] - 31:23
173 [1] - 49:13
18 [1] - 63:2
181 [1] - 49:2
183 [1] - 44:21
188 [1] - 45:3
18th [3] - 1:17,
56:14, 56:24
195 [1] - 1:16
197 [1] - 27:25
1:20 [1] - 61:4

## 2

2 [2] - 48:15, 48:17
2,200 [1] - 42:23
20 [3] - 40:14, 46:17,
52:7
20,000 [1] - 40:18,

40:19
2001 [1] - 8:13
2005 [3] - 4:16, 4:24,
4:25
2006 [2] - 4:24, 5:20
2008 [10] - 40:1,
40:2, 40:9, 43:8, 43:9,
43:13, 43:16, 43:18,
44:5, 44:6
2009 [7] - 1:17,
39:23, 48:15, 48:17,
58:2, 62:15, 63:3
2010 [2] - 63:17,
63:19
2021 [1] - 1:15
2100 [1] - 3:7
21st [1] - 62:15
29 [1] - 2:7
2nd [4] - 44:24,
44:25, 56:14, 56:24

## 3

3 [1] - 42:4
3.5 [1] - 42:3
30 [1] - 2:7
301 [1] - 3:4
35 [2] - 2:7, 2:13
35203 [2] - 3:5, 3:8
36 [1] - 2:16

## 4

4 [1] - 2:3
45 [1] - 6:17
47 [1] - 2:7

## 5

5 [1] - 52:8
50 [2] - 52:10, 52:13
53 [1] - 2:7
54 [1] - 2:7
54002 [1] - 6:12
55 [2] - 2:7, 40:16
59 [1] - 2:7
5:21 [1] - 49:4

## 6

60 [2] - 2:7, 40:16
65 [1] - 40:16
6th [1] - 58:2

## 7

700 [1] - 3:8

## 8

8 [3] - 22:19, 23:20,
63:17

## 9

90 [1] - 6:14
990 [1] - 6:11

## A

a.m [1] - 1:18
abbreviation [2] -
26:22, 30:14
ability [1] - 62:6
able [6] - 18:17,
35:10, 35:12, 42:24,
43:23, 44:3, 50:25,
56:22
absolutely [3] - 5:7,
24:20, 26:19
accessible [1] -
36:19
according [4] - 19:3,
29:3, 35:24, 54:24
account [23] - 9:18,
9:21, 32:6, 36:22,
37:10, 38:21, 38:23,
40:6, 45:2, 45:25,
47:1, 48:1, 48:14,
48:17, 54:18, 55:13,
56:12, 56:22, 57:15,
58:11, 60:20, 60:24
accounts [1] - 9:12
accurate [1] - 33:2
Action [1] - 49:4
action [13] - 5:6,
24:22, 26:24, 26:25,
27:2, 27:5, 27:8,
28:12, 28:24, 59:6,
60:23, 62:13, 62:14
ACTION [1] - 1:6
action/result [2] -
30:6, 30:16
Action/Result [1] -
49:4
actions [1] - 19:12
activities [3] - 5:10,
25:3, 25:7
activity [8] - 36:15,
38:4, 38:10, 44:25,
45:24, 55:12, 55:21,
55:22
actual [2] - 27:11,
39:7
additional [1] - 51:22
address [4] - 6:10,
7:5, 7:7, 7:9
advise [2] - 29:25,
36:8
affects [1] - 48:9
aforesaid [1] - 62:4
age [1] - 31:23
agency [1] - 15:24,

18:10, 57:14
ago [16] - 12:23,
13:20, 14:6, 16:6,
16:8, 16:9, 18:19,
18:21, 21:6, 21:25,
22:15, 22:19, 23:20,
52:22
agree [1] - 20:16
Agreement [1] - 1:13
agreement [2] -
49:25, 54:9
ahead [1] - 29:13
Alabama [1] - 2:12,
3:5, 3:8, 33:11, 33:12,
34:6, 34:22, 36:2,
36:4, 36:13, 36:14
ALABAMA [1] - 1:1
allegations [3] -
16:22, 17:7, 19:18
alleging [1] - 17:4
Alliance [3] - 8:7,
9:2, 17:3
allowed [20] - 2:12,
17:8, 17:11, 17:13,
18:25, 19:4, 31:18,
31:21, 32:3, 32:8,
32:11, 32:14, 32:17,
32:21, 33:2, 33:8,
33:25, 34:3, 34:23,
35:9
ALSO [1] - 3:11
amount [1] - 39:15
ANGELA [1] - 1:4
Angela [1] - 63:2
annuals [1] - 37:19
answer [8] - 17:22,
19:13, 25:9, 28:9,
29:13, 29:21, 29:25,
52:22
ANSWER [1] - 2:18
answered [2] -
26:16, 53:9
apologize [5] -
11:24, 12:1, 13:4,
28:10, 56:25
appear [3] - 25:1,
25:5, 35:5
APPEARANCES [1] -
3:1
appearing [2] - 3:5,
3:9
April [1] - 58:2
area [2] - 31:13,
45:21
ARMS [3] - 27:12,
28:22, 44:13
arrangement [1] -
38:19
arrest [1] - 13:9
arrested [3] - 12:13,

12:22, 15:8
aspect [2] - 17:13,
25:22
assistant [1] - 7:24
assume [1] - 42:24
assuming [1] - 51:19
assumption [2] -
35:7, 35:8
attempted [2] - 26:5,
26:12
attend [1] - 7:25
attorney [4] - 11:19,
19:15, 19:22, 31:19
Attorney [1] - 3:3
attorneys [2] - 62:12,
62:14
August [1] - 42:22
Avenue [2] - 1:15,
3:8
average [2] - 52:7,
52:10
averaged [1] - 43:11
aware [7] - 17:15,
36:15, 47:25, 56:12,
59:5, 59:10, 60:11

## B

bad [7] - 12:20,
13:19, 13:20, 13:21,
14:13, 15:6, 45:22
bail [1] - 14:18
bailed [1] - 14:17
Baldwin [1] - 6:11
Bank [1] - 22:23
Barry [1] - 1:15
base [1] - 42:1
based [2] - 39:5,
47:7
basis [3] - 40:11,
42:8, 46:12
Bates [1] - 27:23
BE [1] - 63:17
became [1] - 59:5
beginning [1] - 43:19
behalf [2] - 3:5, 3:9
best [2] - 14:4, 62:6
better [2] - 42:25,
48:10, 51:14
between [20] - 5:24,
9:1, 16:9, 18:20,
22:19, 40:14, 43:11,
46:10, 46:17, 48:6,
52:7, 52:10, 52:13,
52:17, 52:24, 53:2,
56:13, 56:24, 56:25
bill [5] - 4:18, 15:24,
22:21, 23:1, 23:6
bills [2] - 43:23, 44:1
Birmingham [2] -

3:4, 3:8
  bit [2] - 10:1, 11:17
  Bloomington [3] -
7:5, 7:7, 7:13
  Bloomington's [1] -
7:15
  bonus [9] - 39:1,
42:9, 42:11, 43:13,
43:14, 43:16, 43:25,
44:3, 44:5
  bonuses [2] - 43:8,
43:21
  book [1] - 19:25
  bottom [1] - 27:24
  boyfriend [2] -
21:18, 22:5
  break [3] - 19:15,
19:25, 35:19
  brief [1] - 36:22
  bring [1] - 53:14
  Britton [3] - 2:15,
4:8, 4:9
  BRITTON [5] - 1:12,
4:1, 62:4, 63:1, 63:23
  buckets [1] - 48:12
  Building [1] - 3:4
  BY [2] - 4:6, 63:17

## C

  C-r-o-l-x [1] - 13:8
  card [1] - 18:14
  care [1] - 38:21
  case [14] - 12:2,
15:25, 17:5, 17:8,
17:12, 17:14, 17:16,
17:18, 18:22, 18:24,
20:20, 23:3, 23:8,
23:25
  cease [2] - 36:5, 36:9
  certain [5] - 31:24,
33:10, 33:16, 34:5,
39:20
  CERTIFICATE [1] -
63:17
  certified [1] - 7:24
  certify [2] - 62:3,
63:1
  chance [2] - 19:7,
20:6
  change [1] - 40:10
  changed [7] - 42:5,
45:14, 45:15, 45:16,
45:17, 45:20, 60:14
  changes [2] - 8:23,
40:24
  charged [2] - 62:9,
62:9
  cheat [1] - 36:16
  check [6] - 13:19,

13:20, 13:21, 15:2,
15:5, 15:6
  checks [2] - 12:21,
14:14
  child's [2] - 22:8,
22:9
  circumstances [3] -
33:13, 33:16, 33:21
  city [4] - 7:16, 13:1,
21:7, 22:1
  City [1] - 1:16
  CIVIL [1] - 1:6
  Civil [1] - 1:13
  claims [2] - 19:10,
23:10
  clarify [1] - 11:7
  classes [1] - 37:19
  clear [2] - 52:5,
58:19
  Cleveland [1] - 10:11
  client [6] - 41:3,
41:8, 41:10, 41:13,
41:14, 51:21
  coached [2] - 38:9,
38:11
  code [16] - 26:22,
26:24, 26:25, 27:3,
27:6, 27:8, 27:9,
27:11, 28:11, 28:13,
29:7, 29:8, 30:6, 30:9,
30:16, 44:17, 45:21
  Code [1] - 49:4
  codes [2] - 57:13,
57:14
  Cold [1] - 62:15
  Coleman [1] - 14:19
  collect [7] - 25:16,
40:18, 40:22, 41:23,
47:23, 48:16, 59:12
  collected [5] - 39:6,
39:7, 39:9, 45:2,
60:19
  collecting [5] -
18:12, 32:14, 37:9,
38:18, 38:22
  collection [22] - 5:9,
8:8, 8:15, 9:13, 15:24,
18:10, 19:11, 25:2,
25:7, 25:21, 27:15,
31:11, 36:15, 38:4,
38:6, 38:10, 44:10,
44:25, 55:12, 55:21,
55:22, 60:15
  collections [4] -
5:17, 16:23, 17:5,
19:12
  collector [5] - 4:18,
5:14, 16:25, 24:16,
32:12
  collectors [1] - 59:11

college [3] - 6:25,
7:1, 7:2
  Commission [1] -
62:23
  commission [16] -
25:2, 25:6, 39:5,
39:13, 39:18, 40:20,
40:21, 40:24, 41:5,
42:5, 42:8, 42:17,
47:7, 47:8, 47:9,
47:11, 48:9, 48:11
  commit [1] - 51:8
  company [5] - 8:15,
16:11, 38:15, 48:6,
56:5
  compensates [1] -
47:22
  Complaint [3] - 17:9,
25:9, 56:20
  complaint [1] - 17:9
  complete [1] - 62:6
  computer [3] -
36:21, 36:22, 57:4
  concerned [1] -
37:25
  concluded [1] - 61:4
  conduct [1] - 17:6
  confidentiality [1] -
19:20
  confusing [1] - 29:19
  contact [8] - 26:6,
26:12, 30:20, 31:12,
32:21, 33:3, 50:5,
51:14
  contacted [4] - 49:5,
54:23, 55:4, 55:6
  contacts [1] - 46:17
  contest [1] - 13:12
  continual [3] - 34:9,
37:17, 37:18
  continually [1] -
31:13
  continuously [1] -
6:7
  contract [4] - 47:15,
48:3, 48:6, 62:13
  conversation [16] -
25:25, 28:17, 50:7,
50:10, 50:12, 50:17,
51:1, 51:4, 51:6,
51:20, 52:1, 52:18,
52:19, 52:24, 53:4,
53:18
  conversations [2] -
53:2, 53:12
  convicted [2] -
15:10, 15:12
  copies [3] - 61:6,
62:9, 62:10
  Copy [1] - 2:12

copy [3] - 36:20,
36:23, 36:25
  Corporation [2] -
1:7, 63:2
  correct [32] - 6:9,
9:14, 13:6, 15:20,
15:22, 28:18, 28:19,
28:21, 29:5, 29:6,
31:4, 31:17, 33:1,
33:5, 33:24, 39:11,
39:16, 42:23, 42:24,
45:23, 47:13, 48:3,
51:7, 52:8, 52:9,
52:16, 55:17, 57:5,
60:10, 62:6, 63:3
  Correction [1] - 63:4
  cost [1] - 62:8
  count [2] - 47:8, 47:9
  County [4] - 1:19,
21:8, 23:15, 23:21
  county [4] - 13:3,
14:9, 21:7, 22:1
  course [2] - 35:22,
37:23
  court [4] - 21:1,
21:21, 22:10, 23:10
  COURT [1] - 1:1
  Courts [1] - 1:14
  credit [1] - 18:14
  crimes [1] - 15:10
  Croix [5] - 13:4, 13:5,
22:2, 23:15, 23:21
  current [1] - 6:10
  CV-09-BE-0647-S [1]
- 1:7

## D

  daily [1] - 46:12
  data [2] - 44:11, 45:8
  date [1] - 45:4
  Dated [1] - 63:19
  dated [2] - 28:6,
49:13
  dates [1] - 57:1
  daycare [1] - 24:1
  days [1] - 52:8
  debt [20] - 5:14, 8:8,
8:15, 16:25, 18:12,
18:16, 23:23, 24:16,
25:2, 25:7, 25:16,
31:10, 31:11, 32:12,
32:15, 34:1, 36:15,
38:18, 41:9, 59:11
  debtor [26] - 2:13,
9:25, 26:6, 26:13,
26:16, 27:1, 30:5,
30:11, 30:21, 31:12,
32:9, 32:17, 32:20,
32:25, 33:9, 33:18,

33:19, 33:23, 34:1,
34:4, 34:24, 35:22,
37:14, 39:12, 60:1
  debtors [2] - 39:9,
46:11
  December [1] - 44:5
  Defendant [2] - 1:9,
3:9
  define [2] - 38:17,
49:10
  degree [1] - 7:20
  delinquency [1] -
26:3
  deliver [5] - 2:13,
33:9, 33:17, 33:22,
34:23
  delivered [1] - 61:6
  Dennis [1] - 18:1
  denote [1] - 56:4
  denoted [1] - 35:9
  denotes [1] - 28:12
  department [2] -
24:24, 37:20
  depose [1] - 20:6
  deposed [1] - 20:22
  deposition [9] - 9:9,
17:18, 20:11, 20:24,
35:15, 61:4, 62:4,
62:9, 63:2
  DEPOSITION [1] -
1:12
  desk [1] - 2:16
  desks [1] - 34:21
  detail [1] - 21:14
  details [7] - 20:9,
20:13, 20:18, 51:16,
52:19, 53:4, 53:17
  dialer [1] - 48:23
  different [6] - 11:17,
27:12, 27:16, 37:22,
40:23, 50:1
  diploma [1] - 6:21
  direct [3] - 32:2,
35:3, 55:10
  directly [6] - 9:21,
13:22, 34:11, 54:17,
54:20, 55:6
  disciplinary [3] - 5:6,
59:6, 60:23
  disciplined [3] - 5:8,
38:2, 60:18
  disclose [7] - 18:17,
18:25, 20:3, 24:9,
32:11, 32:14, 32:17
  discovery [1] - 17:22
  discuss [10] - 10:4,
11:3, 17:8, 17:11,
17:13, 24:11, 30:18,
31:10, 32:3, 59:17
  discussed [4] -

10:25, 11:9, 11:17,
29:25
discusses [1] -
59:12
discussing [1] - 32:6
DISTRICT [2] - 1:1,
1:1
District [1] - 1:14
DIVISION [1] - 1:2
docket [1] - 23:5
document [22] -
25:25, 26:7, 26:18,
26:21, 31:3, 34:12,
45:3, 49:23, 54:2,
54:6, 54:11, 54:12,
55:12, 55:20, 59:3,
59:10, 59:18, 59:25,
60:7, 60:11, 60:14
documentation [8] -
9:12, 27:3, 27:7,
28:17, 51:3, 55:18,
56:6, 58:1
documented [4] -
31:1, 49:12, 54:7,
59:1
documenting [3] -
25:20, 57:23
documents [3] - 9:8,
10:2, 55:11
dollars [7] - 39:5,
39:7, 39:8, 39:9, 41:2,
41:6, 41:17
done [2] - 38:20,
55:18
down [2] - 27:24,
28:5
Dukes [1] - 3:7
duly [2] - 3:16, 4:2
during [5] - 24:12,
37:23, 46:8, 46:12,
58:17
DWI [2] - 12:18,
12:22

**E**

earn [5] - 42:1, 42:3,
42:10, 48:11
earned [5] - 40:20,
41:2, 41:4, 41:17,
42:2
easily [1] - 36:19
East [1] - 1:15
education [1] - 6:19
eight [3] - 8:10, 8:12,
14:6
either [2] - 16:20,
19:1
Ellsworth [2] - 21:8,
21:10

employed [4] - 4:9,
4:11, 17:2, 38:3
employee [2] -
62:11, 62:11
employees [1] - 56:8
ended [1] - 29:2
ends [1] - 43:22
enforcement [1] -
24:21
enter [1] - 44:11
entering [1] - 45:8
entire [1] - 43:10
entry [1] - 49:23
equal [1] - 41:5
event [1] - 57:22
exactly [3] - 11:21,
51:12, 52:2
EXAMINATION [2] -
2:2, 4:5
examined [1] - 63:1
example [3] - 27:17,
41:1, 41:13
except [1] - 63:3
exhibit [1] - 27:11
Expires [1] - 62:23
explain [1] - 36:4

**F**

F9 [2] - 56:21, 57:10
fact [1] - 26:18
fair [1] - 53:1
far [5] - 6:13, 17:15,
31:16, 32:6, 43:6
father [2] - 22:8, 22:9
fees [4] - 41:10,
41:12, 41:19, 41:24
felony [1] - 15:12
few [1] - 16:5
fifth [1] - 28:4
figure [1] - 30:4
file [6] - 11:18, 11:23,
12:8, 12:10, 26:21,
54:21, 56:21, 59:1,
59:4
filed [5] - 16:16,
19:17, 23:16, 25:10,
57:24
files [1] - 59:18
fill [2] - 20:8, 20:18
filling [1] - 20:13
financial [1] - 62:13
fine [3] - 11:16,
13:15, 53:1
fined [1] - 13:10
finish [1] - 8:3
firm [1] - 38:6
first [12] - 4:2, 4:14,
4:15, 8:15, 15:16,
15:23, 18:11, 27:7,

28:12, 28:20, 44:16,
45:2
First [2] - 5:13, 5:25
five [5] - 12:23, 14:2,
16:8, 16:9, 21:6
flash [1] - 36:22
fluctuate [1] - 40:10
fly [1] - 20:7
follow [1] - 27:3
follow-up [1] - 27:3
followed [1] - 38:19
following [1] - 3:15
follows [2] - 4:3,
63:3
foregoing [1] - 62:5
form [10] - 29:12,
30:8, 30:23, 35:1,
35:8, 47:17, 54:14,
55:15, 59:19, 60:2
four [4] - 27:9, 27:16,
28:4, 28:12
frame [1] - 24:13
frequently [1] -
57:17
friend [1] - 14:20
full [2] - 8:5, 62:6

**G**

Geisler [1] - 3:7
generally [1] - 21:15
girlfriend [2] - 22:8,
22:9
given [24] - 20:24,
21:1, 21:20, 22:10,
52:17, 53:1, 56:3
goal [1] - 38:13,
38:15, 38:18, 39:19,
39:20, 39:21, 39:22,
40:15, 40:16, 40:18,
47:13
goals [4] - 39:22,
39:24, 40:10, 40:13
governs [1] - 36:15
graduate [1] - 8:6
graduated [1] - 6:20
grandmother [2] -
14:21, 14:22
great [1] - 21:14
grew [1] - 7:17
grow [1] - 7:10
guess [10] - 11:7,
11:20, 26:11, 27:15,
30:3, 42:24, 44:15,
46:14, 59:21
Guest [1] - 49:5
guilty [2] - 13:11,
14:25

**H**

half [3] - 21:24,
46:15, 46:16
HALL [1] - 1:4
Hall [5] - 37:9, 50:10,
53:12, 53:22, 63:2
Hall's [10] - 9:17,
11:18, 11:22, 12:7,
12:10, 38:23, 58:23,
60:16, 60:19, 60:24
Hammond [2] -
12:25, 13:1
hand [2] - 19:23,
62:15
handle [2] - 20:9,
60:15
handled [2] - 60:15,
60:24
handwritten [2] -
9:15, 9:18
hanging [1] - 34:21
harassment [1] -
21:17
hard [3] - 36:20,
36:23, 44:1
hardship [12] -
46:23, 46:24, 46:25,
47:1, 49:17, 49:22,
50:2, 50:4, 50:6,
51:10, 59:12, 60:12
head [2] - 10:9, 31:6
heard [1] - 37:24
Heights [5] - 8:19,
17:25, 18:1, 18:2
heights [1] - 18:4
Hennepin [1] - 1:15
hereby [1] - 62:3
Herring [24] - 2:3,
2:11, 3:3, 7:17, 9:8,
10:8, 11:14, 20:19,
28:2, 30:9, 31:3, 35:5,
35:22, 37:6, 40:8,
47:21, 48:22, 53:11,
54:22, 55:17, 59:24,
60:6, 61:6
HERRING [14] - 4:6,
19:24, 20:5, 20:11,
20:14, 29:17, 29:23,
30:2, 35:18, 36:24,
37:2, 40:5, 48:21,
61:1
Hiawatha [1] - 22:23
high [5] - 6:20, 6:23,
7:3, 8:6, 40:16
High [3] - 6:24, 7:21,
7:25
higher [1] - 48:11
highly [1] - 14:1
hired [4] - 4:14, 4:16,

24:8, 25:19
hit [2] - 39:19, 47:13
holds [1] - 57:13,
57:14
hour [1] - 38:25
Hudson [1] - 22:2
hum [9] - 6:1, 8:14,
15:4, 26:14, 28:8,
28:15, 29:1, 41:7,
52:6
husband [1] - 21:20

**I**

I.C [32] - 1:7, 4:10,
4:12, 4:14, 4:17, 4:19,
5:9, 5:12, 5:23, 5:24,
6:3, 6:7, 6:13, 8:25,
9:2, 9:3, 12:7, 24:8,
25:19, 38:4, 38:13,
40:6, 46:25, 47:22,
55:14, 55:23, 56:13,
58:15, 59:5, 59:11,
59:18, 63:2
IAED [2] - 56:21,
57:10
idea [3] - 13:18, 16:1,
51:15
ideal [1] - 38:15
identification [2] -
56:3, 56:4
identify [1] - 4:7
Illinois [2] - 7:10,
7:11
immediately [5] -
5:22, 14:17, 15:1,
15:3, 53:24
IN [1] - 1:1
inbound [1] - 55:3
Inc [2] - 1:7, 63:2
include [1] - 39:10
income [1] - 26:4
incoming [1] - 48:24
independent [1] -
46:3
Indiana [2] - 7:12
indicating) [1] -
27:18
indication [1] - 56:12
industry [1] - 8:9
information [10] -
24:9, 26:2, 32:1, 32:4,
32:8, 32:20, 32:22,
32:24, 33:4, 34:10
INFORMATION/
DOCUMENT [1] - 2:10
initiative [1] - 54:20
instance [1] - 40:18
instances [1] - 30:12
INSTRUCTIONS [1] -

2:18
intent [1] - 60:22
interaction [1] - 48:14
interest [2] - 62:13, 62:14
interview [1] - 24:12
investigation [1] - 60:22
investigators [2] - 12:6, 12:7
involve [1] - 19:17
it'd [1] - 57:15
itself [2] - 19:19, 46:6

J

jail [2] - 14:12, 14:16
Jamie [1] - 37:8
JANUARY [1] - 63:17
January [11] - 42:7, 44:24, 44:25, 48:15, 48:17, 56:14, 56:24, 57:23, 58:12
Jeremy [2] - 10:11, 10:15
Jeremy's [1] - 10:16
job [4] - 5:6, 51:11, 51:17, 51:18
John [2] - 3:7, 36:24
Johnson [2] - 3:11, 10:22
Jr [2] - 16:15, 17:24
judgment [3] - 14:4, 23:18, 24:4
July [1] - 43:3

K

keep [2] - 9:18, 34:18
keeps [1] - 2:15
Keomani [1] - 22:4
kick [1] - 47:1
kicked [1] - 48:2
kind [4] - 5:5, 17:20, 39:1, 59:24
kinds [1] - 25:24
knowledge [1] - 48:8
known [2] - 56:1, 56:2
Kress [1] - 3:3

L

last [5] - 10:16, 41:1, 42:12, 43:1, 43:17
lasted [1] - 52:1
law [2] - 1:15, 36:14
Law [1] - 3:3
laws [4] - 2:15, 34:9,

36:18, 38:19
lawsuit [8] - 16:22, 18:18, 19:10, 19:19, 52:20, 57:3, 57:25, 58:20
lawsuits [4] - 15:19, 19:17, 23:16, 24:6
lawyer [6] - 9:5, 10:8, 16:12, 18:22, 23:8, 35:13
lead [1] - 17:6
least [1] - 54:11
leave [4] - 4:22, 4:24, 5:5, 5:20, 8:22, 35:9, 56:22
Lebakken [1] - 37:8
left [4] - 4:20, 4:25, 5:2, 5:12
less [2] - 8:2, 52:24
letter [1] - 27:9
letters [3] - 27:7, 27:8, 28:12
Levitt [1] - 10:17
levitt [1] - 10:18
license [1] - 24:18
licensed [3] - 24:15, 25:16
line [3] - 28:2, 28:5, 28:7
Line [1] - 63:4
list [1] - 37:4
located [2] - 8:18, 17:24
location [7] - 31:25, 32:4, 32:8, 32:20, 32:22, 32:24, 33:4
log [2] - 54:3, 56:9
logs [1] - 44:10
look [7] - 20:2, 27:23, 35:12, 37:1, 44:9, 44:24
looking [11] - 27:10, 27:15, 27:20, 28:2, 28:4, 44:21, 45:5, 45:6, 57:4, 57:9, 58:7
Lori [3] - 1:18, 62:3, 63:25
LORI [1] - 62:19
loud [1] - 28:9
love [1] - 50:19
loved [1] - 51:9
lowest [1] - 40:15
Lyons [3] - 16:15, 17:24, 18:23

M

ma'am [1] - 11:6
manager [1] - 5:17
match [1] - 44:21

materials [4] - 2:12, 34:15, 34:25, 35:6
matter [1] - 63:2
mean [19] - 9:2, 11:21, 20:6, 20:12, 20:13, 21:18, 26:9, 26:10, 26:22, 27:2, 27:5, 30:9, 30:25, 35:8, 39:7, 39:12, 41:13, 43:25, 49:10
means [2] - 41:21, 49:5
meet [2] - 12:6, 43:23
memory [1] - 46:3
Mendota [1] - 8:19
message [6] - 2:13, 33:9, 33:17, 33:23, 34:4, 34:24
messages [1] - 35:10
met [3] - 11:11, 11:13, 38:20
might [1] - 50:25
miles [2] - 6:14, 6:17
Mini [1] - 26:3
minimum [3] - 49:14, 49:19, 51:13
Minneapolis [2] - 1:16, 18:7
Minnesota [15] - 1:14, 1:17, 1:19, 7:14, 7:18, 8:19, 16:18, 16:19, 18:8, 24:16, 24:22, 24:24, 25:3, 25:6, 62:15
minor [1] - 19:18
minute [1] - 35:19
Miranda [1] - 26:3
money [2] - 32:18, 38:20
month [14] - 39:22, 40:23, 41:4, 41:11, 41:12, 42:2, 42:11, 42:12, 43:11, 43:12, 43:15, 43:20, 43:22
monthly [3] - 40:11, 42:1, 42:8
months [1] - 4:21
most [2] - 19:16, 19:19
move [1] - 20:2
MR [43] - 4:6, 7:16, 9:7, 10:6, 11:8, 11:11, 19:24, 20:1, 20:5, 20:8, 20:11, 20:12, 20:14, 20:17, 27:20, 27:23, 28:1, 29:12, 29:17, 29:23, 30:2, 30:8, 30:23, 35:1,

35:16, 35:18, 35:20, 36:24, 37:1, 37:2, 37:4, 40:2, 40:5, 47:17, 48:19, 48:21, 53:9, 54:13, 55:15, 59:19, 60:2, 61:1, 61:3
multiply [2] - 41:3, 41:25
MUST [1] - 63:17

N

name [9] - 6:23, 10:16, 13:1, 16:11, 50:19, 50:24, 51:2, 57:13, 60:6
NANCY [5] - 1:12, 4:1, 62:4, 63:1, 63:23
Nancy [1] - 4:8
National [1] - 22:23
need [6] - 20:8, 20:18, 28:9, 29:21, 35:18, 36:12
needed [4] - 27:4, 54:17, 54:19, 54:20
negotiation [1] - 38:20
neighbor [4] - 2:13, 30:22, 34:3, 34:23
new [1] - 51:11
next [3] - 45:24, 48:13, 50:22
nine [1] - 14:5
Nineteenth [1] - 3:4
NO [1] - 1:6
None [1] - 2:19
normally [5] - 30:14, 37:23, 54:5, 54:10, 54:12
North [2] - 3:4, 3:8
NORTHERN [1] - 1:1
NOT [1] - 2:18
Notary [1] - 1:18
notation [2] - 26:20, 30:19
note [4] - 28:18, 29:4, 49:18, 49:23
noted [3] - 29:8, 29:11, 30:16
notes [15] - 9:13, 9:15, 9:18, 9:21, 27:15, 36:23, 46:4, 46:5, 49:20, 51:2, 53:14, 54:24, 55:1, 55:7, 57:17
nothing [1] - 32:6
Notice [1] - 1:13
noticed [1] - 62:9
November [4] - 1:17,

40:9, 62:15, 63:2
number [9] - 19:23, 26:13, 30:4, 45:14, 45:19, 45:20, 45:22, 56:3, 56:4
Number [1] - 7:24
nursing [1] - 7:24

O

oath [2] - 4:3, 62:4
object [11] - 11:8, 29:12, 29:17, 30:8, 30:23, 35:1, 47:17, 54:13, 55:15, 59:19, 60:2
OBJECTIONS [1] - 2:6
obtain [2] - 32:22, 33:3
obtaining [2] - 31:25, 32:4
obviously [3] - 25:13, 31:18, 48:20
October [4] - 39:23, 39:25, 42:12, 43:1
October's [1] - 42:17
OF [2] - 1:1, 1:12
offer [4] - 59:15, 59:24, 60:1, 60:4
offered [5] - 46:20, 46:22, 47:3, 50:1, 50:2
office [10] - 1:15, 18:5, 47:4, 47:6, 47:10, 49:15, 49:19, 50:5, 56:23, 57:17
OKESON [1] - 62:19
Okeson [3] - 1:18, 62:3, 63:25
on-the-job [1] - 5:6
One [1] - 17:3
one [18] - 8:17, 9:2, 12:20, 13:21, 13:23, 15:23, 16:20, 28:4, 34:24, 42:14, 42:18, 43:15, 45:2, 46:20, 46:22, 51:9, 53:8, 53:13
ongoing [1] - 34:15
online [2] - 49:7, 60:9
operator [1] - 44:17
options [5] - 46:21, 46:22, 47:3, 59:13
Order [4] - 21:4, 21:12, 21:16, 21:24
order [1] - 43:22
ordered [1] - 62:9
original [2] - 61:5,

62:8
  otherwise [1] - 62:13
  outgoing [1] - 26:4
  outside [2] - 25:13, 54:10
  owed [3] - 18:12, 18:16, 41:13
  owes [2] - 32:17, 32:18
  own [3] - 54:21, 58:8, 58:9

**P**

P.C [1] - 3:7
  p.m [3] - 35:21, 61:4
  Page [3] - 44:21, 49:2, 63:4
  page [2] - 27:20, 27:24
  PAGE [1] - 2:2
  paid [7] - 15:1, 15:2, 23:5, 38:24, 39:20, 42:8, 51:12
  parent [2] - 30:21, 31:22
  parents [1] - 58:23
  part [2] - 49:24, 51:20
  particular [5] - 26:20, 41:11, 41:12, 53:13
  parties [3] - 62:9, 62:11, 62:13
  party [27] - 26:6, 26:9, 26:10, 26:15, 29:3, 29:9, 30:5, 30:10, 30:13, 30:18, 30:19, 30:20, 30:21, 31:16, 31:19, 31:20, 31:22, 32:3, 32:7, 32:21, 33:3, 33:8, 33:17, 33:22, 33:25, 35:10, 62:9
  Paul [1] - 18:8
  pay [14] - 8:23, 13:15, 20:7, 23:1, 24:4, 28:25, 29:11, 30:7, 34:1, 39:12, 41:23, 43:23, 46:20, 51:15
  paying [6] - 22:21, 41:10, 41:12, 41:19, 41:20, 44:1
  payment [15] - 29:10, 40:4, 48:1, 49:7, 49:9, 49:12, 49:15, 49:19, 51:9, 51:13, 53:24, 54:10, 54:16, 55:4, 57:1

  payments [4] - 47:6, 47:8, 47:9, 51:22
  payout [2] - 42:3, 42:4
  People [2] - 5:13, 5:25
  people [4] - 47:23, 52:7, 52:13, 52:17
  per [3] - 17:11, 43:11, 48:11
  percent [5] - 41:8, 41:9, 41:17, 42:3, 42:4
  percentage [8] - 39:20, 40:21, 41:2, 41:4, 41:19, 41:23, 41:25, 48:11
  perfect [3] - 38:12, 38:14, 38:18
  performance [2] - 42:4, 48:12
  perhaps [2] - 18:20, 22:19
  period [4] - 5:22, 46:9, 46:13, 58:17
  permanent [1] - 57:20
  person [5] - 26:17, 30:21, 31:23, 50:22, 56:3
  personal [1] - 5:4
  persons [1] - 62:14
  Peterson [1] - 21:13
  phone [11] - 9:25, 19:25, 20:10, 20:11, 20:18, 26:16, 45:7, 45:14, 45:19, 46:3, 46:6
  Pierce [1] - 21:8
  pierce [4] - 13:4, 14:10, 23:15, 23:21
  place [4] - 39:2, 48:3, 55:13, 62:4
  Plaintiff [2] - 1:5, 3:5
  plaintiff [1] - 15:21
  plan [2] - 46:23, 49:22
  plead [2] - 13:11, 14:25
  pled [1] - 13:12
  point [4] - 4:21, 5:4, 49:14, 57:7
  policies [1] - 56:7
  possible [2] - 51:3, 53:15
  posted [3] - 14:18, 53:24, 57:2
  potential [1] - 60:23
  prefer [1] - 19:7
  preparation [1] - 9:9

  PRESENT [1] - 3:11
  present [1] - 6:8
  pressing [1] - 56:21
  previously [2] - 33:19, 50:3
  pride [1] - 53:7
  Primary [1] - 49:4
  print [1] - 58:4
  privileged [1] - 29:24
  problem [1] - 20:5
  Procedure [1] - 1:13
  procedures [1] - 56:8
  proceedings [1] - 3:15
  Professional [1] - 62:20
  program [1] - 8:3
  programs [5] - 46:24, 46:25, 47:1, 50:2, 60:13
  promised [2] - 39:12, 39:15
  promises [1] - 39:10
  proper [3] - 30:9, 36:5, 36:8
  provide [1] - 35:13
  provided [1] - 37:18
  public [2] - 17:9, 19:18
  Public [1] - 1:18
  pursuant [1] - 1:12
  put [5] - 20:16, 20:17, 26:21, 30:10, 36:12

**Q**

  qualified [1] - 62:3
  quarter [1] - 43:17
  questions [3] - 20:15, 29:18, 61:3
  quick [2] - 52:3, 60:8
  Quick [1] - 60:12
  quit [1] - 35:23

**R**

  range [2] - 40:12, 40:25
  rate [1] - 62:10
  re [1] - 26:11
  re-ask [1] - 26:11
  reach [2] - 23:3, 40:17
  read [2] - 61:3, 63:1
  really [1] - 48:4
  reason [1] - 26:3
  reasons [1] - 5:4
  receive [6] - 34:15,

42:11, 42:14, 42:18, 47:7, 48:1
  received [11] - 34:14, 38:20, 39:8, 40:6, 41:3, 41:6, 41:8, 41:17, 42:13, 43:7, 47:9
  Recess [1] - 35:21
  recollection [1] - 50:9
  record [4] - 4:7, 17:10, 19:18, 57:20
  recorded [1] - 12:3
  records [2] - 28:18, 56:11
  Recoveries [1] - 5:13
  referring [1] - 41:15
  refusal [3] - 28:24, 29:11, 30:7
  regarding [4] - 12:7, 49:12, 55:21, 60:23
  regardless [2] - 47:15, 55:13
  regards [8] - 25:20, 25:25, 31:9, 31:25, 32:4, 37:14, 38:10, 56:8
  Registered [1] - 62:20
  rehired [1] - 6:2
  related [5] - 5:9, 11:22, 21:3, 25:2, 25:6
  relative [2] - 62:11, 62:11
  rely [1] - 43:22
  remain [2] - 50:4, 54:18
  remember [25] - 8:3, 10:15, 14:13, 14:18, 15:25, 16:2, 16:4, 16:10, 42:25, 43:17, 46:5, 50:7, 51:5, 51:16, 51:20, 51:23, 51:25, 52:2, 52:18, 53:4, 53:6, 53:11, 53:13, 53:15, 57:3
  remove [2] - 47:4, 57:16
  removed [1] - 47:5
  renegotiated [1] - 54:21
  repeat [3] - 29:15, 32:23, 55:19
  rephrase [1] - 59:22
  Reported [1] - 63:25
  reporter [1] - 62:3
  Reporter [1] - 62:20
  represented [2] - 9:5, 31:19

  REQUEST [1] - 2:10
  request [1] - 58:8
  requeued [2] - 57:15, 57:16
  required [4] - 28:16, 29:4, 36:11
  resource [1] - 60:9
  response [2] - 26:8, 35:25
  Restraining [4] - 21:4, 21:12, 21:16, 21:24
  result [14] - 5:5, 13:9, 14:11, 17:16, 26:1, 26:24, 26:25, 27:3, 27:5, 27:9, 28:12, 30:7, 34:16, 49:6
  RETURNED [1] - 63:17
  review [6] - 9:8, 9:11, 9:15, 10:2, 12:10, 62:7
  revisit [1] - 20:3
  revoked [1] - 24:18
  Rod [7] - 10:13, 37:8, 37:11, 37:12, 37:21, 38:9
  rose [1] - 14:19
  roundtrip [2] - 6:14, 6:15
  RP [2] - 28:23, 28:24
  RPR [2] - 1:18, 62:3
  Rules [1] - 1:13

**S**

  S-t [1] - 13:8
  save [1] - 58:5
  saw [1] - 34:10
  school [3] - 6:20, 6:23, 8:6
  School [1] - 6:24
  Scott [4] - 2:7, 3:7, 61:7
  SCOTT [29] - 7:16, 9:7, 10:6, 11:8, 11:11, 20:1, 20:8, 20:12, 20:17, 27:20, 27:23, 28:1, 29:12, 30:8, 30:23, 35:1, 35:16, 35:20, 37:1, 37:4, 40:2, 47:17, 48:19, 53:9, 54:13, 55:15, 59:19, 60:2, 61:3
  screen [6] - 56:15, 56:21, 57:4, 57:8, 57:16, 58:5
  seal [1] - 62:15
  second [3] - 18:18,

20:16, 27:8
see [5] - 20:3, 45:3, 45:5, 48:16, 56:5
seem [1] - 54:4
semi [1] - 37:19
semi-annuals [1] - 37:19
sent [4] - 56:12, 56:16, 58:11, 58:14
September [2] - 6:6, 42:18
serve [2] - 13:13, 14:16
set [12] - 31:2, 40:19, 49:7, 49:13, 49:16, 49:22, 50:3, 50:5, 51:9, 51:22, 54:16, 54:19
sets [1] - 27:16
settlement [5] - 17:16, 19:3, 19:16, 19:21, 23:3
settlements [1] - 19:19
seven [1] - 16:9
several [1] - 53:9
shakes [1] - 10:9
Sheet [1] - 2:15
sheet [2] - 36:16, 36:17
shocked [1] - 37:2
short [1] - 19:25
shorthand [2] - 62:3, 62:4
show [4] - 45:22, 55:1, 56:11, 57:15
showed [1] - 58:10
showing [1] - 55:3
shows [1] - 57:14
sic [1] - 18:4
side [4] - 55:14, 55:22, 55:23
sign [1] - 61:3
sit [1] - 50:21
six [4] - 4:21, 12:23, 21:6
Slade [1] - 1:15
small [1] - 23:10
someone [1] - 31:11
sometimes [2] - 27:14, 40:10
somewhat [2] - 50:8, 50:11
sorry [7] - 7:12, 13:12, 29:15, 35:19, 40:1, 48:21, 52:11
Source [2] - 60:8, 60:12
source [1] - 26:3
south [1] - 7:16

SOUTHERN [1] - 1:2
speaking [2] - 29:3, 46:12
specific [4] - 31:2, 50:19, 53:14, 57:12
specifically [3] - 17:6, 37:16, 45:9
spell [2] - 13:7, 18:3
spoken [1] - 10:10
spouse [1] - 31:20
Spring [3] - 6:24, 14:8, 62:15
St [5] - 13:4, 13:5, 18:8, 22:2, 23:15, 23:21
stan [1] - 20:1
Stan [1] - 3:3
standings [1] - 54:18
start [1] - 44:15
started [3] - 43:1, 51:8, 51:18
State [5] - 1:16, 1:19, 24:22, 24:24, 25:3
state [10] - 2:15, 25:4, 25:5, 25:14, 25:17, 36:1, 36:2, 36:4, 36:14, 63:1
state's [1] - 36:18
statement [8] - 2:12, 11:22, 12:3, 12:4, 12:11, 34:22, 35:3, 53:3
states [5] - 4:3, 31:20, 31:24, 33:10, 34:5
stay [1] - 23:5
stays [1] - 47:10
Stearns [1] - 1:19
stenographic [1] - 62:4
still [6] - 18:6, 34:20, 47:11, 52:18, 53:4, 57:24
stone.. [1] - 31:2
stop [1] - 37:15
Street [2] - 3:4, 6:11
structure [5] - 8:23, 39:1, 39:5, 40:24, 42:5
study [1] - 7:23
style [1] - 15:25
subject [1] - 24:21
Sue [2] - 3:11, 10:22
sue [2] - 16:24, 18:24
sued [14] - 15:14, 15:24, 16:2, 16:10, 16:24, 18:11, 19:4, 22:12, 22:20, 22:22, 23:1, 23:12, 23:25, 24:2

sult [3] - 16:16, 18:9, 18:11
Suite [2] - 1:16, 3:8
Summit [1] - 6:11
sunshine [1] - 24:1
supervisor [2] - 37:7, 37:10
supposed [16] - 25:24, 26:7, 26:18, 26:21, 35:25, 36:2, 36:6, 36:8, 37:13, 53:22, 55:11, 55:20, 56:9, 59:15, 59:17, 59:25
suspended [1] - 24:19
sworn [2] - 4:2, 17:20
System [9] - 1:7, 9:22, 27:12, 44:13, 44:15, 55:11, 55:20, 56:9, 63:2
system [9] - 5:23, 8:25, 9:22, 27:13, 44:11, 44:17, 45:16, 55:10, 57:24
system's [5] - 12:7, 55:14, 55:23, 59:11, 59:18
Systems [1] - 4:10
systems [21] - 4:12, 4:14, 4:17, 4:19, 5:9, 5:12, 5:24, 6:3, 6:7, 6:13, 9:3, 24:8, 25:19, 38:4, 38:13, 40:6, 46:25, 47:22, 56:13, 58:15, 59:5

## T

Target [28] - 41:16, 41:18, 46:23, 47:2, 47:16, 47:22, 48:2, 48:7, 49:16, 49:22, 50:5, 51:14, 53:23, 54:19, 54:23, 54:25, 55:5, 55:6, 55:12, 55:14, 55:22, 56:7, 56:13, 56:17, 58:11, 58:14, 59:11, 59:12
teamwise [1] - 42:2
Tech [3] - 7:3, 7:21, 7:25
technically [2] - 18:13, 18:16
telephone [5] - 28:20, 28:21, 28:22, 28:23, 28:24
Telephoned [1] - 49:5

telephoned [1] - 29:2
ten [3] - 13:25, 16:6, 22:16
terminated [1] - 59:8
terms [13] - 19:3, 19:16, 19:21, 49:8, 49:10, 49:11, 49:25, 54:9, 54:12, 54:15, 54:16, 54:19, 54:21
testified [1] - 48:20
testimony [17] - 10:4, 10:11, 10:13, 10:18, 10:20, 10:23, 11:1, 11:19, 17:20, 20:20, 21:1, 21:20, 22:10, 25:1, 25:6, 58:10, 62:6
THE [19] - 1:1, 1:1, 10:7, 11:10, 11:13, 27:22, 27:25, 29:15, 29:22, 30:1, 30:25, 35:3, 35:17, 40:3, 40:7, 47:19, 54:15, 59:21, 60:4
thinks [2] - 29:18, 29:23
Third [1] - 3:8
third [27] - 26:6, 26:9, 26:10, 26:15, 29:3, 29:9, 30:5, 30:10, 30:13, 30:18, 30:19, 30:20, 31:16, 31:19, 31:20, 31:22, 32:3, 32:7, 32:21, 33:3, 33:8, 33:17, 33:22, 33:25, 35:10, 46:15
third-party [1] - 35:10
three [12] - 8:21, 18:19, 18:20, 27:16, 28:4, 46:21, 46:24, 47:3, 50:1, 50:2
tired [1] - 52:11
TO [2] - 2:18, 28:22
today [10] - 9:5, 10:5, 10:25, 11:4, 11:5, 11:14, 11:19, 50:21, 52:18, 52:20
Tommy [3] - 16:15, 17:24, 18:23
took [4] - 5:21, 5:24, 40:3, 62:3
TORP [1] - 28:14
total [3] - 14:13, 41:9, 43:7
touch [1] - 19:22
toward [1] - 47:8
towards [1] - 47:9
TP [2] - 30:18

train [2] - 37:12, 37:21
trained [3] - 26:5, 26:12, 26:17
training [14] - 25:20, 29:4, 31:9, 31:13, 31:14, 34:9, 34:14, 34:15, 35:24, 37:17, 37:18, 37:19, 37:20, 59:24
trains [1] - 59:11
transcript [5] - 61:5, 62:5, 62:7, 62:8, 63:1
transcription [1] - 62:6
transfer [1] - 57:13
trial [4] - 13:11, 14:23, 22:24, 23:5
Troy [1] - 21:13
true [2] - 62:5, 63:3
try [3] - 32:21, 33:3, 48:16
trying [2] - 30:4, 31:12
TSYS [11] - 27:12, 44:11, 44:15, 44:17, 54:24, 55:1, 55:7, 55:11, 55:18, 55:20, 56:9
twice [2] - 12:16, 15:18
two [14] - 4:13, 5:22, 15:19, 18:19, 18:20, 21:24, 27:7, 27:8, 28:4, 28:20, 35:19, 46:20
two-minute [1] - 35:19
two-year [1] - 5:22
type [2] - 9:21, 54:12
typewritten [1] - 63:1
typically [1] - 19:20

## U

um-hum [9] - 6:1, 8:14, 15:4, 26:14, 28:8, 28:15, 29:1, 41:7, 52:6
unable [1] - 46:20
under [6] - 1:13, 31:23, 33:13, 33:21, 47:15, 62:4
understandable [1] - 52:12
unit [1] - 6:11
University [3] - 7:3, 7:21, 7:25
unlawful [4] - 16:23, 17:5, 19:11, 19:12

unless [3] - 19:17, 31:18, 31:23
up [23] - 6:7, 7:10, 7:17, 12:2, 19:12, 20:16, 20:17, 27:3, 29:2, 34:21, 38:3, 40:15, 44:21, 49:7, 49:13, 49:16, 49:22, 50:3, 50:5, 51:10, 51:22, 54:16, 54:19
update [1] - 57:17

## V

Vadnals [3] - 17:25, 18:2
VADNIAS [1] - 18:4
Valley [2] - 6:24, 14:8
value [1] - 14:13
Vang [1] - 22:4
various [2] - 2:15, 36:17
vary [1] - 39:22
verbatim [1] - 62:3
verified [2] - 26:2
versus [1] - 27:12
viewed [3] - 56:20, 56:22, 58:4
Volkers [2] - 10:13, 37:11
vs [2] - 1:6, 63:2

## W

wage [1] - 42:1
wait [1] - 17:21
waived [1] - 62:7
warrant [2] - 12:20, 14:11
WCAD [2] - 56:15, 57:15
week [4] - 52:8, 52:13, 52:15
weeks [1] - 52:14
WHEREUPON [1] - 3:15
Wisconsin [8] - 6:11, 7:19, 7:20, 12:25, 14:8, 16:19, 21:9, 22:2
witness [1] - 62:6
WITNESS [17] - 10:7, 11:10, 11:13, 27:22, 27:25, 29:15, 29:22, 30:1, 30:25, 35:3, 35:17, 40:3, 40:7, 47:19, 54:15, 59:21, 60:4
Witness [3] - 10:9, 31:6, 62:15

words [1] - 26:15
works [1] - 40:17
write [1] - 30:20
writing [1] - 36:12
written [6] - 12:4, 12:5, 15:2, 17:22, 20:21, 38:3
wrote [3] - 13:20, 15:5, 53:3

## Y

y'all [4] - 23:3, 29:24, 30:14, 47:15
year [7] - 5:19, 5:22, 8:2, 21:24, 42:12, 43:10, 43:19
year-and-a-half [1] - 21:24
years [21] - 4:13, 8:10, 8:12, 8:21, 12:23, 14:6, 16:5, 16:6, 16:8, 16:9, 18:19, 18:20, 18:21, 21:6, 21:25, 22:15, 22:19, 23:2, 23:20
yourself [3] - 4:7, 16:25, 57:8

## Z

ZE [1] - 44:18
ZE7863 [3] - 44:18, 44:19, 45:6